## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

C.S., an individual,

                Plaintiff,

v.

SUBWAY WORLDWIDE, INC.
DOCTOR'S ASSOCIATES LLC,
SUBWAY IP LLC,
FRANCHISE WORLD HEADQUARTERS, LLC,
GRB INVESTMENTS, LLC
GRB SUBWAY PROPERTIES LLP and,
MIDWEST SUBWAY DEVELOPMENT, LLP
(all Defendants collectively d/b/a "Subway")

                Defendants.

Case No. 3:24-CV-31

**COMPLAINT AND
JURY DEMAND**

## I.  INTRODUCTION

1.      This case is about Defendants' destruction of a young, vulnerable human life.

2.      Plaintiff, a teenager excited about her first job as a "sandwich artist" at a local Subway in Jamestown, North Dakota, was repeatedly raped by her 52-year-old supervisor, both at work and outside of work, often after being plied with drugs.

3.      Defendants did this to her. That is, Defendants, through their respective roles in the "Subway Franchise System" ("Subway"), are responsible for the unspeakable harm Plaintiff suffered and continues to suffer, because it was due to their actions and inactions

1

that Plaintiff's rapist was hired **despite being a known, registered sex offender** recently released from prison with a conviction record of violence and of sexually assaulting children.

4.      Moreover, the action against Plaintiff, perpetuated by Defendants, goes beyond repeated rape. These were not isolated events. Rather, Plaintiff's rapist, enabled by Subway, subjected Plaintiff to sex trafficking: using his authority as a Subway supervisor and threats of violence, Plaintiff's rapist forced Plaintiff into a months long quid pro quo in which he supplied Plaintiff drugs to which he had gotten her addicted in exchange for sex acts.

5.      As a result of Defendants providing her with the most horrific introduction to the workplace imaginable, Plaintiff for a time descended into homelessness, becoming a drug-addicted rape victim living on the streets.  Her life will never be the same. She is a different person, and the scope and magnitude of what she has lost is nearly indescribable.

6.      Yet the tragedy of this case is far from an anomaly for Subway.

7.      Subway, one of the largest fast-food employers in the country, has a history and habit of hiring, supervising, directing, and promoting sexual predators, including pedophiles, who use their positions to coerce, entice, and obtain sex from the vulnerable— including former Subway pitchman Jared Fogle and his sexual exploitation and predation of children.

8.      On information and belief, Subway's corporate headquarters was aware, through its local, regional, and senior executive management, of Fogle's depraved behavior

2

and sexual interest in children well before the 2015 exposure of his criminal behavior. Yet Subway leadership took no action to prevent Fogle's predatory behavior, because Subway preferred, for financial reasons, to protect its carefully cultivated public image and brand as a wholesome, healthy, family-friendly franchise.

9.      This same motivation—money—is what motivated the conduct that resulted in the nightmare experienced by Plaintiff and many other Subway employees. Indeed, Fogle is far from the only sexual predator employed and enabled by Defendants through their corporate culture of willful blindness intended to protect Subway's profits and public image at all costs, even if it means causing and allowing franchisees, including the one at which Plaintiff worked, to hire rapists.

10.     As described below, the appalling number of sexual predators who have been caught preying on Subway employees in recent years evinces how Defendants' implementation of the Subway Franchise System includes a pattern and practice of delivering teenage employees into the hands of predatory supervisors through grossly negligent hiring, supervision, and training.

11.     This pattern and practice, which starts at the very top, stems from and perpetuates a dangerous and toxic corporate culture of "see no evil, hear no evil, speak no evil", with Subway franchise owners and managers as well as franchisor regional managers and corporate executives turning a blind eye to sexual misconduct and the resulting destruction.

12.     The engrained, corporate-driven nature of this culture and the resulting

3

policies, pattern and practices is further evinced by the fact that, so far, nothing has caused Subway to take any meaningful measures to break the cycle of destruction—not police inquiries, not FBI investigations, not documentaries exposing these appalling practices, and certainly not empathy for victims.

13.    Plaintiff's experience in this case is illustrative of Subway's systemic sexual harassment and assault history. Rather than protect child workers, Subway franchise owners and general managers as well as its franchisor's corporate regional supervisors, field consultants, trainers, and human resources professionals with direct influence and authority over daily franchise operations, knowingly stood by and allowed the subject violent threats, assault, rape, and trafficking, to continue unabated.

14.    In many instances, instead of protecting these vulnerable employees, Subway retaliated against those who complained, consistent with Subway's system-wide strategy of causing and tolerating the hiring of managers with a history of sexual misconduct, and then ignoring the consequences and the foreseeable harm that follows.

15.    In addition to the financial motivation inherent in concealing and/or turning a blind eye to employee sexual misconduct, each Defendant also has a financial motivation to implement and tolerate recklessly low hiring standards and to ignore glaring red flags when making hiring decisions.

16.    For example, Defendants each desire Subway restaurants, including the one where Plaintiff was assaulted, to fill staffing needs as quickly as possible as cheaply as possible, because this means more revenue and lower costs.

4

17.     Indeed, despite having notice of pervasive sexual harassment and assault against mostly minor, female employees at its franchise restaurants nationwide, Subway's executives have declined to take any meaningful steps to prevent or address sexual assault by Subway employees or the company culture that enables it.

18.     For example, despite having the duty, knowledge and wherewithal:

19.     **Defendants have done nothing** to ensure any training occurs at Subway restaurants regarding sexual assault, sexual harassment, and/or sex trafficking.

20.     **Defendants have done nothing** to effectively train their respective employees and managers about how to (A) prevent, identify, investigate, or respond to sexual assault, sexual harassment, and/or sex trafficking; or (B) prevent the hiring of convicted sexual predators.

21.     **Defendants have done nothing** to effectively address, hold accountable, or otherwise change the behavior of managers who hire rapists and/or tolerate or allow sexual assault, sexual harassment, and/or sex trafficking to occur at their respective Subway restaurants.

22.     **Defendants have done nothing** to train regional managers, consultants, and other agents who supervise numerous restaurants on how to avoid hiring sexual predators and/or prevent, identify, and investigate sexual assault, harassment, and/or sex trafficking.

23.     **Defendants have done nothing** to provide effective human resource services or training, or to assist in enabling effective investigation of reports of sexual assault, sexual harassment, and/or sex trafficking.

24. **Defendants have done nothing** to address or prevent repeat offenses at problem restaurants or problem areas or regions, instead permitting management to simply shuffle harassers and assaulters around to different restaurants, where they are free to harass and assault again.

25. Making matters worse, Defendants omit the above failures in the material representations relied upon by current and prospective employees like Plaintiff, such as in Subway's centralized, corporate-driven recruitment pitch, published by Defendant Subway IP LLC at https://apply.mysubwaycareer.com/us/en/careers/, which misrepresents wellness, personal growth, training, and career opportunity as among the many surefire benefits Subway provides.

26. Indeed, it was reasonable for Plaintiff to believe that she was working for a large corporate employer—a household name— with adequate resources dedicated to human resources and pre-screening issues, including the prevention of sexual harassment, sexual assault, workplace drug use, workplace violence; resolution of employees' complaints; and a safe working environment where she would not be repeatedly exposed to illegal drugs, sexual assault, threats of violence, battery, and rape.

27. Instead of taking responsibility to address and eliminate this dangerous environment at its restaurants, Defendants, through their respective agents and employees, exert operational pressure on individual and regional Subway restaurant managers and "business development agents" to continue to staff restaurants with minimal personnel with little to no experience, training, or supervision in order to achieve revenue projections and

profit.

28.     Because of Defendants' respective actions and inactions, there exists reckless disregard and grossly negligent supervision of managers' and supervisor's conduct and hiring decisions, which perpetuates hostile and dangerous work environments, including the one that resulted in teenaged Plaintiff being assaulted by a 52-year-old convicted rapist.

29.     And in Plaintiff's case, Defendants, through their respective agents, knew or should have known that Plaintiff was being sexually assaulted and trafficked by her Subway supervisor.

30.     In short, Subway puts profits above people, protecting pedophiles, rapists, and sex traffickers so long as they keep making and selling sandwiches.

31.     Underage employees, especially underage female employees, have suffered unimaginable harms because of the dangerous environment that Subway perpetuates. Many are impressionable, vulnerable high school students working in low-paid, menial roles because they have few other options due to their age, lack of education, and circumstances.  These traumatic experiences stay with them for a lifetime, causing pain from which they will never fully recover.

## II.  PARTIES

32.     Plaintiff C.S. is an 18-year-old resident of Fargo, North Dakota.

### A.     <u>The Franchisee Defendants</u>

33.     **Defendant GRB Investments, LLC ("GRB")** is a North Dakota limited liability company doing business as "Subway" with a principal place of business located

at 73 Broadway, Fargo, North Dakota 58107.

34.     Defendant GRB is owned and managed by Brent Olson and is engaged, with its co-defendants and through its owners and agents, in the operation and control of multiple Subway restaurants in North Dakota, including the Subway restaurant located at 1921 8th Ave SW, Jamestown, North Dakota 58401 where Plaintiff was employed and where her rapist assaulted her and kept and exchanged the drugs used to coerce Plaintiff into sex acts.

35.     **Defendant GRB Subway Properties, LLP ("GRB Subway Properties")** is a North Dakota limited liability partnership doing business as "Subway" with a principal place of business located at 73 Broadway, Fargo, North Dakota 58107.

36.     Defendant GRB Subway Properties is owned and managed by Brent Olson and Richard Olson and is engaged, with its co-defendants and through its owners and agents, in the operation and control of multiple Subway restaurants in North Dakota, including the Subway restaurant located at 1921 8th Ave SW, Jamestown, North Dakota 58401 where Plaintiff was employed and assaulted. For example, it serves as the landlord for Defendant GRB and the property where Plaintiff was employed and where her rapist assaulted her and kept and exchanged the drugs used to coerce Plaintiff into sex acts.

37.     **Defendant Midwest Subway Development, LLP ("Midwest")** is a North Dakota limited liability partnership doing business as "Subway" with a principal place of business located at 73 Broadway, Fargo, North Dakota 58107.

38.     Defendant Midwest is owned and managed by Brent Olson, Richard Olson,

John Clark, and Peter Knoff and is engaged, with its co-defendants and through its owners and agents, in the operation and control of multiple Subway restaurants in North Dakota, including the Subway restaurant located at 1921 8th Ave SW, Jamestown, North Dakota 58401 where Plaintiff was employed and where her rapist assaulted her and kept and exchanged the drugs used to coerce Plaintiff into sex acts.

39.     Defendant Midwest, along with its owners Brent Olson and John Clark, is also a Subway "Business Development Agent," in which capacity they are directed by the corporate Subway Franchisor Defendants described below to engage in and oversee franchise sales activities, franchise site location assistance, franchise management training and supervision; and franchisee day-to-day operations, including Defendants GRB, Midwest, and GRB Subway Properties.

40.     Defendants GRB, Midwest, and GRB Subway Properties (herein collectively "Franchisee Defendants") have the same headquarters and registered agent and operate, through the agents and employees, as a single, integrated enterprise and entity, at the direction of the same managers and subject to the same policies, operating procedures and standard practices.

41.     At all times relevant to this complaint, the three Franchisee Defendants jointly employed Plaintiff through their exercise of control over the terms and conditions of her employment.

**B.     The Franchisor Defendants**

42.     **Defendant Subway Worldwide Inc. ("SWI")** is a Delaware corporation

with a principal place of business located at 325 Sub Way, Milford, CT, 06461.

43.    Defendant SWI does business globally and throughout the United States under the name "Subway" through its ownership and/or operational control over various affiliates, including each of the co-defendants named in this action.

44.    The business of Defendant SWI and its affiliates includes the sale and operation of Subway franchises, with Defendant SWI exercising oversight and control over its affiliates through its agents, employees, and executives, including but not limited to Subway Chief Executive Officer John Chidsey, Subway Chief Operating Officer Mike Kappit, President of Subway-North America Douglas Fry, and Subway Chief Human Resources Officer Lisa Shea.

45.    **Defendant Doctor's Associates, LLC ("DAL")** is a Florida limited liability company with a principal place of business located at 325 Sub Way, Milford, CT, 06461.

46.    Defendant DAL does business globally and throughout the United States under the name "Subway" through various affiliates, including each of the co-defendants in this action.

47.    The business of Defendant DAL and its affiliates includes the sale, oversight and operation of Subway franchises, with Defendant DAL executing, signing, and enforcing Franchise Agreements with franchisees on behalf of itself and its affiliates.

48.    Defendant DAL's ultimate parent company is Defendant SWI, which controls, operates and owns Defendant DAL through its agents, employees, executive management, and a series of holding companies, including Subway US Holdings, LLC,

Subway Systems Holdings, LLC, and Subway Worldwide Holdings, LLC.

49.     **Defendant Subway IP, LLC (SIP)** is a Delaware limited liability company with a principal place of business located at 325 Sub Way, Milford, CT, 06461.

50.     Defendant SIP does business globally and throughout the United States under the name "Subway" through various affiliates, including each of the co-defendants in this action.

51.     Defendant SIP is an affiliate of Defendants SWI and DAL and is the owner and licensor of the Subway® trademark and all recipes, formulas, food preparation procedures, business methods, business forms, and business policies and practices (referred to by Defendants as the "Subway Franchise System" or "System"), which it licenses to Defendant DAL and implements in concert with each of the co-defendants.

52.     Like Defendant DAL, Defendant SIP's ultimate parent company is Defendant SWI, which controls, operates, and owns Defendant FWH through its agents, employees, executive management, and a series of holding companies, including Subway SIP Holdings, LLC; Subway US Holdings, LLC; Subway Systems Holdings, LLC; and Subway Worldwide Holdings, LLC.

53.     **Defendant Franchise World Headquarters, LLC (FWH)** is a Connecticut limited liability Company with its principal place of business located at 325 Sub Way, Milford, Connecticut, 06461.

54.     Defendant FWH is an affiliate of Defendants, SWI, DAL, and SIP, and, in concert with SWI, DAL, and SIP, provides direction, control, and oversight of franchisee

operations, including sales paperwork; research and development, marketing, management training; retail technology; POS System support; restaurant design; legal and accounting operations; negotiating, administering, and renewing leases/licenses for restaurant premises; and staffing and hiring policies and practices.

55.     Like Defendant DAL and SIP, Defendant FWH's ultimate parent company is Defendant SWI, which controls, operates and owns Defendant FWH through its agents, employees, executive management, and a series of holding companies, including Subway US Holdings, LLC, Subway Systems Holdings, LLC, and Subway Worldwide Holdings, LLC.

56.     Defendants SWI, DAL, SIP, and FWH (collectively the "**Franchisor Defendants**") have the same headquarters and operate as a single, integrated enterprise, at the direction of common managers and executives and subject to the same policies and practices through which they harmed Plaintiff.

57.     At all times relevant to this complaint, the Franchisor Defendants, themselves and with the Franchisee Defendants, jointly employed Plaintiff through their exercise of control over the material terms and conditions of her employment, including the corporate policies and practices, or lack thereof, that caused harm to Plaintiff.

58.     At all times relevant to this complaint, the Franchisee Defendants were agents of the Franchisor Defendants, acting on behalf of the Franchisor Defendants with actual and apparent authority and subject to the direction and control of the Franchisor Defendants.

59.     For example, as referenced above, Defendant GRB and its owners Brent Olson and John Clark work directly for Defendant DAL and the Franchisor Defendants as so-called "Subway Business Developers"— also referred to as "Business Development **Agents**"—(emphasis added) through which they exercise oversight, control, and authority, on behalf of the Franchisor Defendants, over all aspects of the day-to-day operation of <u>not only their own franchise but also **all** Subway franchises located in the State of North Dakota and in 16 counties throughout the State of Minnesota.</u>

60.     Thus, as described in further detail below, the Franchisor Defendants, through their respective executives as well as regional Business Developers, field consultants, and other agents, hold and exercise apparent and actual authority to control the material working conditions of employees, including Plaintiff, at Subway's franchised restaurants, including but not limited to:

-       Human Resources policies and practices;

-       workplace safety policies and practices;

-       workplace rules, codes of conduct, and enforcement thereof;

-       the hiring, training and supervision of restaurant managers, shift supervisors, and crew members; and

-        the physical work environment.

61.     At all times relevant to this Complaint, Defendants provided or caused the provision of training to franchisees regarding the hiring and supervision of restaurant managers and supervisors which was recklessly inadequate and/or grossly negligent insofar

13

as it failed to address or prevent the hiring of a convicted sexual predator and subsequent sexual assault and battery and harassment against Plaintiff, which occurred onsite at one of Defendants' Subway restaurants.

62.     At all times relevant to this complaint, the Franchisor Defendants contract with and/or have agreements with numerous franchisees with whom they jointly operate Subway restaurants throughout North Dakota, including the restaurants owned and operated by Defendants GRB, Midwest, and GRB Subway Properties, i.e. the Franchisee Defendants.

63.     The Franchisee Defendants' operation of Subway restaurants emanates from Subway's corporate headquarters.

64.     For reasons set forth herein, Plaintiff, a minor when hired, reasonably believed that she worked for the Connecticut-based Franchisor Defendants, a single, integrated entity engaged in the operation of Subway restaurants.

65.     Plaintiff's above-stated reasonable belief that she was employed by the Franchisor Defendants was grounded upon, inter alia, the fact that Plaintiff:

-       applied through a centralized Subway corporate application;

-       wore a Subway uniform and served Subway food and products;

-       was required to follow Subway's policies and practices;

-        was surrounded by Subway décor and the Subway logo;

all of which were designed, maintained, and controlled by the Franchisor Defendants.

66.     Furthermore, Plaintiff was expressly told by the Franchisee Defendants that she worked for Subway, and it was expressly and impliedly communicated to her that her work must be performed consistent with the direction, and to the satisfaction, of the Franchisor Defendants.

67.     As such, the Franchisee and Franchisor Defendants, and each of them, are jointly and severally liable for Plaintiff's injuries.

68.     Additionally, the Franchisor Defendants are liable for the Franchisee Defendants' acts and omissions because the Franchisee Defendants are agents of the Franchisor Defendants.

### III.    JURISDICTION AND VENUE

69.     Jurisdiction is based on federal question. The amount in controversy exceeds $75,000.00 (seventy-five thousand dollars).

70.     This Court has supplemental jurisdiction over Plaintiffs' state law claims arising under the statutory and common law under 28 U.S.C. § 1367(a) because those claims are joined with substantial and related claims under federal law. The Court also has subject matter jurisdiction over those claims pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims are interrelated with Plaintiff's federal claims and arise from a common nucleus of operative facts such that the adjudication of Plaintiff's state law claims with Plaintiff's federal claims furthers the interest of judicial economy.

71.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, and facts giving rise to Plaintiff's claim

occurred in this District.

**III.**                                     **FACTUAL ALLEGATIONS**

**A.      From their Connecticut Headquarters, The Franchisor Defendants
Direct and Control the Franchisee Defendants' Material Employment Practices and
Policies and Hold Themselves Out, with the Franchisee Defendants, as One Entity and
Employer, with the Franchisee Defendants Also Acting as Agents of the Franchisor
Defendants**

72.      Plaintiff incorporates by reference herein the preceding paragraphs of this
Complaint.

73.      The Franchisor Defendants oversee, direct and control approximately 67
Subway restaurants in North Dakota, including the store owned and operated by the
Franchisee Defendants, where Plaintiff worked.

74.      The Franchisor Defendants develop common tools and procedures at their
Milford, Connecticut headquarters to be used at all Subway restaurants throughout the
country, including North Dakota, for recruiting, hiring, orientation, training, maximizing
employee performance, etc. Franchisees, including the Franchisee Defendants, utilize these
tools to operate their Subway restaurants, as required by, and under the scrutiny of, the
Franchisor Defendants.

75.      As introduced above, the Franchisor Defendants and Franchisee Defendants
comprise a single integrated enterprise that operates, directs, and controls most every
aspect of the Franchisee Defendants' employment-related policies and procedures,
including those governing the training, hiring, and supervision of Subway restaurant
managers and supervisors.

16

76.     The Franchisor Defendants' control of the Franchise Defendants' employment policies and procedures starts at the top, with Chief Human Resources Officer Lisa Shea. A 25-year veteran of Subway's corporate leadership team with an operations background, Ms. Shea is responsible for Subway's human resources (HR) strategies, including talent management and recruitment, workplace safety, employee relations, and System-wide HR policies.

77.     The Franchisor Defendants' control of the Franchise Defendants' employment policies and procedures also spans the entire life of the Subway franchise, starting from the time the franchise opens and continuing through the regular audits, inspections, site visits, and other forms of direct and indirect oversight and direction conducted by the Franchisor Defendants' agents, including but not limited to employees and contractors, such as Business Development agents, field consultants, and regional executives.

78.     The Franchisor Defendants' control of the Franchisee Defendants' employment practices and policies begins with the initial training the Franchisor Defendants provide, receipt and completion of which is required to open and operate a Subway restaurant.

79.     Specifically, new franchise owners must personally, or through a Designated Manager, complete the Franchisor Defendants' "Franchisee Training Program," which includes 60 hours of "on-the-job training" provided in a different local Subway restaurant, 40 hours of web-based training courses, and 10 hours of "facilitated

training."

80.     The Franchisor Defendants also provide training to franchisees on-site at their corporate headquarters, where the Franchise Training Program is designed and implemented through executives like Nicole Misencik, Manager of Global Learning & Development.

81.     On information and belief, the Franchisor Defendants intentionally provide grossly inadequate training on employment practices such as manager and supervisor hiring and supervision, as illustrated by the hourly allocation of their 40-hours of web-based training courses:

| | |
|---|---|
| Sandwich Artistry, POS, Guest Services & Thru-Put, and Sales/Inventory Reporting | **24 hours** |
| Recruiting & Hiring, Developing Staff | **1 hour** |

82.     The 60 hours of "on-the-job training," on the other hand, does not specifically allocate <u>any</u> time to hiring or employment practices, instead focusing on sandwich preparation, restaurant maintenance and general restaurant operations, with the degree of focus varying based on what the Franchisor Defendants consider to be the needs of a particular training group.

83.     Thus, while the Franchisor Defendants have a set of common policies with respect to the prevention of sexual harassment and assault in Subway franchise restaurants; reporting and investigating complaints of sexual harassment in Subway restaurants; and related training, they have **intentionally minimized** the role of such polices in their

franchisee training and declined to act reasonably to ensure, via training or oversight, that such policies are understood and implemented by their franchisees, including the Franchisee Defendants.

84.     Accordingly, Defendants' common sexual harassment and assault policies are, in practice, and either intentionally or as a result of gross negligence or reckless disregard, wholly inadequate and ineffective.

85.     The Franchisor Defendants also exercise control of the Franchisee Defendants' employment practices and policies in part by wielding the actual and apparent authority inherent in the Franchisor Defendants' ability to terminate a franchisee's right to continue franchise operations for even a single violation of the Franchisor Defendants' rules.

86.     Indeed, the Subway Franchise Agreement requires franchises, including the one owned and operated by the Franchisee Defendants, to do business as Subway in strict accordance with the extremely long and detailed Subway "Confidential Operations Manual" designed, maintained, provided, and enforced by the Franchisor Defendants.

87.     As required by the Franchisor Defendants, the Franchisee Defendants have constant access to an electronic copy of the Confidential Operations Manual via the Franchisor Defendants' centralized Subway intranet website.

88.     On information and belief, the Confidential Operations Manual contains not only all the confidential recipes, formulas, and food preparation procedures the Franchisee Defendants must strictly adhere to, but also the extensive business methods, business

forms, and business policies and practices the Franchisor Defendants direct the Franchisee Defendants to exclusively employ and follow, including methods, forms, and policies for the hiring and supervision of Subway restaurant managers and supervisors.

89.     Similarly, Franchisor Defendants use their Confidential Operations Manual in combination with their direct regional and local oversight of the Franchisee Defendants to ensure that the Franchisee Defendants comply with Subway's "System Standards," i.e. mandatory specifications, standards, operating procedures designed, prescribed and enforced by the Franchisor Defendants.

90.     The Franchisor Defendants strictly monitor compliance with their Confidential Operations Manual and System Standards via monthly inspections during which their field consultants complete detailed "Restaurant Evaluation and Compliance Reviews," and/or similar reports, to document and record areas of noncompliance.

91.     To facilitate this direct supervision, the Franchisor Defendants' Franchise Agreements all state that they have:

> the right of entry and inspection of the Premises at all reasonable times and, additionally, shall have the right to observe the manner in which you are rendering your services and conducting your operations, to confer with your employees and customers, to inspect your Computer Systems select ingredients, food and non-food products, beverages, and other items, products, materials and supplies for test of content and evaluation purposes to make certain that the services, ingredients, products, materials, equipment and operations are satisfactory and meet the quality control provisions and performance standards established by us….

92.     The Franchisor Defendants' control and authority over the Franchisee Defendants also extends to the identity of the latter's employees and managers, i.e.

**individual hiring and firing decisions**.

93.     For example, in addition to requiring that all franchisees keep them informed at all times of the identity of a "Designated Manager," the Franchisor Defendants maintain the right to replace any managers, including but not limited to any of the Designated Managers, who they determine are not qualified or suitable to operate a Subway Restaurant.

94.     Indeed, the Franchisor Defendants are directly involved in the hiring process for individual franchises, including the Franchisee Defendants, via their centralized "carriers" website, which solicits and processes job applications for individual Subway restaurants.

95.     The Franchisor Defendants exercise their authority over their franchises much the same way any large business exercises control over regional and local operations, i.e. through various levels of executives and regional managers acting on their behalves.

96.     In turn, these agents act to ensure that other agents, e.g. individual business units and employees, i.e. the Franchisee Defendants and their staff, are acting on the Franchisor's behalf in the desired manner.

97.     For example, Business Developers, also referred to by the Franchisor Defendants as "Business Development Agents" and "franchise brokers," are, in reality, the operational equivalent of a Regional Vice President or similar mid-level corporate executive with operational authority over and responsibility for operations in multiple locales, and who reports to a more senior corporate executive.

98.     Compensated and directed by the Franchisor Defendants' Connecticut and Florida-based senior executives, Business Developers are among the Franchisor's "eyes, ears, and arms" and primary representatives in the field.

99.     Specifically, Business Developers provide wide-ranging, day-to-day support and direction to franchisees in all their operations, including food preparation and safety issues, customer relations, sales, site selection and leasing, and employment practices in addition to conducting inspections to make sure that franchisees are acting effectively on behalf of the Franchisor Defendants, such as by strictly adhering to the Confidential Operations Manual, maintaining certain sales volumes, etc.

100.    Through not only their Business Developers but also other agents and employees, the Franchisor Defendants are responsible for the Franchisee Defendants' compliance with all Subway HR and employment policies and procedures, including ensuring that all HR practices, principles, policies, and procedures are followed and applied effectively.

101.    For example, the Franchisor Defendants' Regional HR Consultants routinely provide HR direction and oversight in the field to individual restaurant managers and Business Developers, including the Franchisee Defendants and its owners, while coordinating directly with the Franchisor Defendants' Corporate Legal Department in Connecticut.

102.    These HR Consultants are thus part of the Franchisor Defendants' system of centralized control and decision-making, which is overseen from their Connecticut

headquarters via a reporting chain of command governing the operations of franchisee restaurants that goes all the way up to senior executives of the Franchisor Defendants.

103.     Defendant GRB and its owners Brent Olson and John Clark are part of the Franchisor Defendants' centralized chain of command in their capacity as Business Development Agents and have received awards from the Franchisor Defendants for the financial performance of the franchises under their supervision, including the Franchisee Defendants.

104.     On information and belief, the Franchisor Defendants were aware, through the intense oversight and control described above, of the acts and omissions that caused Plaintiff's assault, including but not limited to the assault itself and the Franchisee Defendants' decision to hire a convicted pedophile and place him in a negligently unsupervised position of authority over Plaintiff, a vulnerable high school student.

105.     Thus, the Franchisor Defendants and the Franchisee Defendants are jointly and severally liable for causing, and/or failing to prevent and remediate, the acts of sexual harassment, abuse, sexual assault, sex trafficking, false imprisonment, and civil rights violations complained of herein.

106.     Defendants are also liable under the integrated employer/enterprise doctrine.

**B.     The Franchisor Defendants Have a History, Habit, Pattern, and Practice of Permitting the Employment of Dangerous Sexual Predators**

107.     As introduced above, Plaintiff is far from the only Subway employee who

has been sexually assaulted because of the Franchisor Defendants' corporate culture of turning a blind eye to the results of its negligently deficient training, direction and oversight of its franchises' employment practices.

108.    The following is a mere sample of the jarring number of similar assaults, i.e. just some of those that are part of public record:

109.    In September 2023, 49-year-old Stephen Lemmond was convicted of sex crimes involving multiple females who worked under his supervision, including four who were under the age of 18 during his time as the Manager of two Subway restaurants in Canada.  *See* https://barrie.ctvnews.ca/former-barrie-subway-manager-sentenced-to-7-years-behind-bars-for-sex-crimes-1.6549922.

110.    In June 2023, 34-year-old David Love was arrested after being accused of raping an employee during the night shift at an Evansville, Indiana Subway where he was the Manager. *See* https://www.wevv.com/news/crime/police-evansville-subway-manager-accused-of-raping-employee/article_fe8c3ec0-0c4c-11ee-8c71-9bac4236e2eb.html.

111.    In April 2019, 34-year-old Nathan McNeal was arrested and charged with two counts of sexual misconduct with a minor after being accused of sexually assaulting a 15-year-old employee of the Fort Wayne, Indiana Subway where he was the Manager. *See* https://wowo.com/former-subway-manager-arrested-for-sexual-involvement-with-minor-employee/.

112.    In December 2018, a New York Subway franchisee faced an EEOC lawsuit alleging that one of its adult managers offered jobs to teenagers in exchange for sex and

then declined to hire them when they refused. *See* https://www.nbcnewyork.com/news/local/ex-subway-manager-offered-to-trade-teens-jobs-for-sex-suit/1815881/.

113.    In August 2018, 19-year-old Jordan Matthew Johnson was arrested and charged with sexual battery and rape after being accused of drugging and raping a coworker during a shift at an Evansville, Indiana Subway. *See* https://nypost.com/2018/08/24/subway-employee-accused-of-drugging-raping-co-worker-during-shift/.

114.    In May 2018, 25-year-old Christopher Rosario was arrested and charged with rape, unlawful restraint, corruption of a minor, and numerous other counts after being accused of raping a teenage co-worker at a Western Pennsylvania Subway. *See* https://www.pennlive.com/daily-buzz/2018/05/subway_restaurant_employee_acc.html.

115.    In April 2017, 38-year-old Garfield Oates was arrested for sexual battery after three former employees, including a 17-year-old, accused him of groping their breasts and buttocks while working at a Subway in Fuquay-Varina, North Carolina where he was the Manager. *See* https://abc11.com/subway-manager-fuquay-varina-sexual-battery/1899425/.

116.    In January 2017, 25-year-old Jessie Danielle Hamilton was charged with first degree sexual assault after being accused of having a sexual relationship with a 16-year-old employee of the Prairie Grove, Arkansas Subway where she was the General Manager, sending him nude photos, scheduling him for shifts where they would be alone,

and bribing him with promises of a pay raise. *See* https://wcel.nwaonline.com/news/2017/jan/25/former-restaurant-manager-charged-20170/.

117.     In June 2016, 28-year-old Cameron Edward Miles was charged with four counts of sexual assault of a child after being accused of raping a teenage Subway coworker in the parking lot after a shift and two years later was sentenced to 42 years in prison. *See* https://www.dallasnews.com/news/courts/2018/05/31/man-gets-42-years-for-raping-juvenile-co-worker-outside-denton-subway/.

118.     In August 2013, 41-year-old Vishnubhai Patel was charged with sexually assaulting a teenaged employee at a Subway in Swatara Township, Pennsylvania where he was the Manager. *See* https://cumberlink.com/news/local/crime-and-courts/police-lemoyne-subway-manager-charged-after-assaulting-teen-employee/article_9dbcf884-0bec-11e3-8807-001a4bcf887a.html

119.     Despite this lengthy track record, the Franchisor Defendants have not implemented any meaningful changes to the Subway System's practices and policies regarding franchisee training or oversight with respect to the hiring and supervision of managers, supervisors, and crew members, generally, or sexual assault prevention and reporting, specifically.

120.     Finally, the sexual assaults perpetrated against Plaintiff are also not the first to occur under the watch of the Franchisor Defendants' North Dakota Business Development Agent and Franchisee Defendant owner John Clark, as it was at his

26

Watertown, South Dakota Subway restaurant where a 29-year-old Manager sexually assaulted a 15-year-old employee in 2015.

**C.     Plaintiff's Horrific Workplace Experience Began When Assigned to Work Under a Known Pedophile and Sex Offender, Who Used His Status as a Subway Supervisor to Abuse, Drug, Assault, Batter, Rape, and Traffick Her**

121.    In or around 2020, Zeferino Carlos Rangel was hired to work as a supervisor on the noon to 9 p.m. (closing) shift at the Jamestown, North Dakota Subway store located at 1921 8th Ave SW.

122.    At the time of hire, Rangel was a convicted child sex offender, who had recently been released from prison after serving a lengthy sentence for committing a pattern of sexual crimes against minors, including an eight-year-old victim as well as teenage victims. Rangel had a history of perpetrating sexual offenses against his victims while the victims were drugged and/or unconscious. At the time that the Franchisee Defendants hired him, Rangel was on supervised probation with North Dakota Parole and Probation.

123.    In or around April 2020, shortly before Rangel was hired to work at the Jamestown Subway store as a supervisor, the Jamestown, North Dakota Police issued a warning to the public about Rangel for public safety purposes.

124.    The warning stated that Rangel had committed sex crimes against children and teenagers and that Rangel's sex offenses included acts against drugged/unconscious victims. The warning stated Rangel had been assigned a "high-risk" assessment by the North Dakota risk level committee of the North Dakota Attorney General's Office. The warning provided a description and photo of Rangel, as well as his new address.

27

125.    The Franchisee Defendants were aware—or should have been aware absent gross negligence or reckless disregard—of the police's public safety warning about Rangel.

126.    Despite the widespread public warning, and despite Rangel's documented history of sexual assault against children and teenagers, which would have been discovered in any criminal background check, the Franchise Defendants, acting through their employees and as agents of the Franchisor Defendants, hired Rangel anyway and put him in charge of teenage employees.

127.    In or around May 2022, Plaintiff was informed by a fellow high school student that Subway was hiring and that they were open to high school applicants.

128.    In or around May 2022, while in high school, Plaintiff applied for a job at Subway.

129.    General Manager (GM) MariAnn Letcher interviewed Plaintiff for the job.

130.    During the interview, Letcher asked Plaintiff if Plaintiff could pass a background check, indicating that Letcher clearly understood that background checks were an important component of the hiring process. Plaintiff responded that she could pass a background check.

131.    In or around June 2022, the Franchisee Defendants, through their agent GM Letcher, and on behalf of the Franchisor Defendants, hired Plaintiff to work as a crew member/sandwich artist on the 4:30 p.m. to 9 p.m. (closing) shift on weekdays and on the noon to 9 p.m. (closing shift) on weekends at the Jamestown, North Dakota, Subway located at 1921 8th Ave SW.

28

132.     During the hiring process, Plaintiff informed GM Letcher, and other Subway employees, that she was a 17-year-old high school student.

133.     At the time of Plaintiff's hire, Plaintiff was living at home with her mother, three younger siblings, and other family members, was doing well in school, and was starting summer school to get ahead in her studies so she could graduate early.

134.     At the time of Plaintiff's hire, Rangel was 52 years old, more than thirty years Plaintiff's senior.

135.     Plaintiff was unaware that Rangel was a registered sex offender.

136.     After Plaintiff was hired, General Manager Letcher told Plaintiff to listen to Rangel, that he was the Shift Supervisor, and that he was in charge.

137.     Letcher praised Rangel to, and in front of, Plaintiff, stating and implying that Rangel was an exceptionally valuable employee, e.g., that he was the most dependable employee, that he was "a star employee, and that he could always be counted on to cover a shift and to close the store.

138.     Plaintiff was informed by GM Letcher and by Shift Supervisor Rangel that the only two employees that had keys to the store, were Letcher and Rangel.

139.     At all times relevant to this Complaint, the only two employees that had keys to the store (other than the Franchisee Defendants' owners) were Letcher and Rangel.

140.     Plaintiff was informed by Rangel that although there were security cameras in the Subway store where Plaintiff worked, the cameras were inoperable.

141.     At all times relevant to this Complaint, the Franchisee Defendants and the

Franchisor Defendants were either (1) aware, through their employees and agents, that the security cameras at the Subway where Plaintiff worked were inoperable; or (2) believed that the security cameras were in fact operable yet failed to sufficiently check them—or any hypothetical existing footage— for safety purposes.

142.    As the GM, a significant part of Letcher's job, as defined and directed by the Franchisor Defendants, was to supervise and oversee the day-to-day operation of the Subway where Plaintiff worked, the revenues of which flowed to both the Franchisee Defendants and Franchisor Defendants.

143.    However, Letcher, either intentionally or with gross negligence or reckless disregard, was frequently absent from the Subway where Plaintiff worked and/or failed to provide direct supervision or oversight.

144.    For example, Letcher would often fraudulently have Rangel or one of the other Subway employees clock her in and out.

145.    The Franchisor Defendants and Franchisee Defendants were aware of Letcher's tendency to leave the store where Plaintiff under the supervision of Rangel.

146.    Therefore, oftentimes the only other employees who worked with Plaintiff and Rangel on the shifts Plaintiff worked were employees named Tanner and Johnny, who, unbeknownst to Plaintiff at the time, **were both *also* registered sex offenders**.

147.    Occasionally, another teenaged employee would work on the shift. Otherwise, Plaintiff worked with Rangel alone on her shifts.

148.    In short, the Franchisee Defendant managed its operations so that Plaintiff,

an underage female, worked alongside three male registered sex offenders or alone with one male registered sex offender. Either way, at all times, Plaintiff was required to work under the supervision of Rangel, the most severe and violent sex offender of the three.

149.    During or around Plaintiff's first week of work for Subway, Rangel began to use his position to groom Plaintiff for his criminal sexual desires.

150.    Plaintiff was told to call Rangel "Uncle Carlos" and so she called him that at work.

151.    Neither the Franchisor Defendants nor the Franchisee Defendants ever provided Plaintiff with any training regarding workplace violence, sexual harassment, or sexual assault.

152.    Upon information and belief, the Franchisor Defendants and Franchisee Defendants never provided workplace violence, sexual harassment, sexual assault, or sex trafficking-related training to any employee on Plaintiff's shift, including Rangel.

153.    The only training or instruction that Plaintiff received, other than training on her first day pertaining to how to make the sandwiches and how to clean, was that she was to listen to Rangel.

154.    Subway's Employee Training Manual, designed and implemented by the Franchisor Defendants, directly and materially enabled Rangel's sexual assault and sex trafficking of Plaintiff, saying only this for guidance on how to address problems with a superior:

"If you do happen to have an issue with the manager or with a particular employee, **you must try to get along with them** in order to maintain a

31

pleasant atmosphere." (emphasis added).

155.   In or around Plaintiff's first week of work, Rangel told Plaintiff he noticed that she looked tired.

156.   In response, Plaintiff mentioned to Rangel that she was feeling exhausted—that she was working for more financial stability and that when she was not at work, she was attending summer school to stay ahead on her studies. Plaintiff also told Rangel that she was also helping take care of her little siblings and the rest of her family.

157.   Eager to do well at work and to be seen as an employee worthy of her employer's confidence, Plaintiff also apologized to Rangel for appearing tired and was quick to point out that even with everything on her plate, she was determined to do well at her job.

158.   One day, while at work at the Subway store, Rangel presented to Plaintiff a substance that he said would help her feel less tired and told Plaintiff to follow him.

159.   Plaintiff assumed Rangel just wanted her to follow him to the back of the store for supplies, but he pulled her into the Subway Men's bathroom instead.

160.   Once in the bathroom, Rangel gave Plaintiff a Subway straw and instructed Plaintiff use it to inhale the substance, a white powder in a line top on the top of the trashcan, through her nose.

161.   At the time, Plaintiff did not know what the powder was.

162.   Trapped and pressured due to Rangel's physical size, aggressiveness, and status as her superior, Plaintiff followed Rangel's instructions.

163.    On information and belief, the substance Rangel directed Plaintiff to take was cocaine.

164.    Until that day in the bathroom of the Subway where she worked, Plaintiff had never taken cocaine.

165.    Sometime thereafter, while at work, Rangel showed Plaintiff another substance which he said would also help her and instructed her to take it.

166.    Plaintiff now knows the substance to have been crystal methamphetamine.

167.    Until Rangel gave her crystal methamphetamine, Plaintiff had never used crystal methamphetamine.

168.    In the weeks that followed, Rangel often had illegal drugs, including methamphetamine and cocaine, delivered to the Subway store while he and Plaintiff were working.

169.    Eventually, Rangel gave Plaintiff illicit drugs nearly every day, sometimes multiple times a day.

170.    Because Rangel's driver's license was suspended, General Manager Letcher and Supervisor Rangel began to require Plaintiff to give Rangel rides to and from work.

171.    Plaintiff eventually became addicted to the drugs Rangel provided and directed and pressured her to use. As a result, she struggled to focus at work and school without the drugs.

172.    Once addicted, Plaintiff wanted the drugs and Rangel gave them to her—but only in exchange for sex acts.

173.    Supervisor Rangel's predatory pattern included the following repeated conduct: Rangel would give Plaintiff a bag of cocaine or methamphetamine during Plaintiff's shift. Then, before Plaintiff's shift ended, Rangel would remind Plaintiff that he gave her the substance earlier, and would demand, in exchange, that Plaintiff perform oral sex on him, either before he would let her leave the store, or at his home, after Plaintiff gave him a ride home from work.

174.    In a drugged state and not knowing what else to do, Plaintiff would submit to Rangel's demands and give him oral sex. This happened repeatedly for months.

175.    Numerous times, while Plaintiff was under the influence of drugs, Rangel sexually abused, assaulted, and raped Plaintiff, including on work premises in the Subway store's bathroom.

176.    At times, when Plaintiff and Rangel were at work, Rangel would send Plaintiff messages, including text messages, signaling her to provide him with sex acts.

177.    Rangel further enticed Plaintiff to provide him with sex acts by means of promise of career advancement at Subway, reminding her of his status and influence at Subway.

178.    Rangel further enticed Plaintiff to provide him with sex acts by means of providing Plaintiff with "free" Subway food to which she was not already entitled—at times enough to share with her little siblings as well.

179.    Plaintiff also observed Rangel provide "free Subway food" to drug dealers whom he had come to the Subway store, as part of the drug exchanges.

180.   Plaintiff was scared of Rangel. On the occasions when Plaintiff tried to refuse Rangel's sexual demands, Rangel threatened to harm her livelihood as well as her family—the people Plaintiff valued most.

181.   Specifically, Rangel threatened to fire Plaintiff if she did not continue to exchange sex acts for drugs.

182.   And specifically, Rangel also threatened to hurt or kill Plaintiff's family members, including her little brother, and her uncle, and her grandfather, if Plaintiff did not perform sex acts on him in exchange for drugs or cooperate as he wished when he raped her.

183.   Plaintiff believed Rangel's threats, because he showed her weapons that he said he would use to harm her and her loved ones.

184.   Despite the fact that it was illegal for Rangel to possess a firearm due to his past criminal convictions, Rangel demanded that Plaintiff bring him one of her grandfather's guns, pictured here, and threatened Plaintiff and her family if she did not comply.



185.     Rangel's demands that Plaintiff go back with him to his home after their closing shift only escalated; and once they arrived, Rangel would take Plaintiff into his bedroom, lock and barricade the door (using multiple locks, a board under the doorknob, and bent nails over the door's entrance); demand that Plaintiff remain silent; and then rape her.

186.     Plaintiff eventually reported via telephone to the Subway GM Letcher that Plaintiff wanted to be transferred to another store, explaining to Letcher that she was feeling extremely uncomfortable at work, specifically with regard to the employees on her assigned shift, including Rangel, and begging to be allowed to switch stores entirely or, at the very least, to be permitted to work on a shift other than the night/closing shift.

187.     In response, Letcher told Plaintiff she would take care of it, but ultimately took no action to help Plaintiff and effectively ignored Plaintiff's request, report, and plea for help.

188.     On numerous occasions, in addition to forcing Plaintiff into other sex acts, Rangel raped Plaintiff vaginally and did not use protection, putting Plaintiff at risk for pregnancy, sexually transmitted diseases, and other physical harm.

189.     After one such occasion, Rangel gave Plaintiff a pregnancy test and she took it. The test was positive, indicating that Plaintiff was pregnant.

190.     When Rangel saw the positive pregnancy test, Rangel gave Plaintiff  potent liquor and a large quantity of potent drugs including what Plaintiff now knows to be crystal

methamphetamine and fentanyl, and demanded Plaintiff to take *all* of it, to force an abortion. This almost killed Plaintiff—she was unconscious for a time and when she somewhat regained consciousness, she was bleeding and severely ill.

191.    Shortly thereafter, while at work, Rangel gave Plaintiff a second pregnancy test. Plaintiff went into the Subway store's bathroom and took the pregnancy test. It was now negative. The abortion forced upon Plaintiff and caused by Rangel had worked.

192.    Rangel's sexual abuse and assault of Plaintiff continued.

193.    Unbeknownst to Plaintiff, on some occasions, Rangel filmed Plaintiff performing sex acts on him.

194.    In one such video recording taken by Rangel, Plaintiff is seen wearing her Subway uniform work shirt while performing oral sex and other sex acts on Rangel.

195.    In one such video recording taken by Rangel, Plaintiff is seen and heard saying that she wants to stop the sex act, and Rangel is seen and heard saying that she is not allowed to stop because he is her boss, so she has to keep going as he demands (or words to that effect).

196.    This horror happened repeatedly over many months.

197.    On one particular occasion, multiple employees quit their jobs at the Jamestown Subway in one day. General Manager Letcher was angry because that meant she had to come in and help cover the shifts in their place. Plaintiff was relieved and hopeful that Letcher's presence at closing time would deter Rangel from harming Plaintiff that night.

198.    The relief was short lived: Letcher was in a terrible mood, stated that she should not have to do the cleaning (which was customarily done before closing), and that as the General Manager, she was above cleaning the Subway store. Letcher stated that she was not staying until the end of the shift, that Plaintiff and Rangel needed to do the cleaning by themselves, and then left in a huff—leaving Plaintiff alone to close with Rangel. That night, like so many others, Rangel sexually assaulted Plaintiff.

199.    Throughout this period of repeated assaults and sex in exchange for drugs, Plaintiff's attendance at school dwindled.

200.    Plaintiff's mother contacted GM Letcher and told her of her concern that Subway was keeping her daughter, Plaintiff, working at the store so late when she closed, as minors are legally not supposed to be working past a certain time at night.

201.    Letcher responded to Plaintiff's mother that she couldn't tell her about her daughter's schedule.

202.    General Manager Letcher further stated to Plaintiff's mother that it was not her (Letcher's) job to "play babysitter."

203.    Plaintiff was almost always high on illegal drugs from Rangel when she returned home, and her mother warned Plaintiff that if she did not stop, she would be kicked out of the house.

204.    Plaintiff was so addicted at that point that she was physically unable to stop using the drugs Rangel gave her.

205.    Because Plaintiff could not stop using the drugs, she was eventually kicked

out of the house.

206.     Plaintiff needed the money from her Subway employment more than ever, and continued to comply with Rangel's demands inside and outside of the workplace in exchange for Rangel not causing Plaintiff to be terminated.

207.     On or around November 15, 2022, Plaintiff was at school when the then-principal pulled her aside and asked if she was okay because she did not appear to be okay.

208.     In response, Plaintiff broke down emotionally and told the then-principal about the horror she was experiencing at Subway and that she could not bear it any longer.

209.     In reply, the then-principal notified law enforcement and Plaintiff went to the hospital, where staff performed a rape kit and Plaintiff told law enforcement officers what had happened to her.

210.     Plaintiff went from the hospital to the Subway store and gave her notice of resignation and crossed her name off the employee list.

211.     On or around November 16, 2022, after an investigation by police, Rangel was arrested for engaging in sex acts with Plaintiff, a minor.

212.     In Rangel's mug shot, he is wearing the Subway uniform the Franchisee and Franchisor Defendants provided to him and required him to wear.



*Zeferino Carlos Rangel's mugshot*

213.    Because Plaintiff's school attendance had dwindled as explained above, Plaintiff had been told that if she missed a single more day of school, she could not graduate.

214.    Thereafter, Plaintiff had to attend a criminal court hearing as a victim and anticipated witness against Rangel and, as a result, missed another day of school, resulting in her being expelled from high school and prevented from graduating.

215.    At first, in the criminal case against him, Rangel presented a defense which included his role as a valued supervisor at Subway, claiming in a post-arrest handwritten statement that Letcher had "told me that I could have all the hours I wanted plus offered me the keys to the store and made me her lead supervisor. While working at Subway I was making over 2,000 every 2 weeks taking home 1,800 every check."

216.    Ultimately, Rangel entered a guilty plea and was sentenced to 25 years in prison.

217.    In media coverage announcing Rangel's arrest and subsequent conviction to the public, it was announced that the minor victim "worked at Subway."

218.    The Franchisee Defendants and Franchisor Defendants refused to timely pay, or cause to be paid, Plaintiff's last paycheck.

219.    The Franchisee Defendants stated that the reason Subway was holding Plaintiff's final paycheck was because Plaintiff failed to turn in her Subway uniform work shirt.

220.    However, Defendants knew that the reason that Plaintiff could not turn in her Subway Unform work shirt was because the shirt was in police custody as evidence of Rangel's crimes against Plaintiff—crimes to which the Franchisor and Franchisee Defendants contributed.

221.    As a result of the sexual abuse, assault, and trafficking, Plaintiff has suffered unimaginable trauma, emotional distress, mental anguish, humiliation, embarrassment, inconvenience, fear, loss of enjoyment of life, as well as other mental and physical injuries.

## IV.    CAUSES OF ACTION

### COUNT I: CLAIM FOR VIOLATION OF THE TVPRA / SEX TRAFFICKING OF PLAINTIFF
### (Against All Defendants.)

222.    Plaintiff hereby incorporates all preceding paragraphs by reference.

223.    The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1591, prohibits the sex trafficking of children or adults by force, fraud, or coercion.

41

224.    To establish unlawful sex trafficking under the TVPRA, a Plaintiff must show that the perpetrator "(1) recruited, enticed, harbored, transported, provided, obtained, or maintained a person; (2) knowing that force, threats of force, coercion, or any combination of such means would be used; (3) to cause the person to engage in a commercial sex act." *Doe v. Knight*, 624 F. Supp. 3d 857, 862 (E.D. Mich. 2022) (quoting *United States v. Bixler*, 2022 WL 247740, at *7 (6th Cir. Jan. 27, 2022) and *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018)).

225.    The TVPRA, 18 U.S.C. § 1591(e)(3), defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

226.    Until recently, the TVPRA, despite the broad definition of "commercial sex act," was largely used only to "prosecute archetypal sex trafficking cases (i.e. torture, child prostitution, child pornography)." *Knight*, 624 F. Supp. 3d at 863.

227.    In the last several years, courts interpreting the TVPRA have recognized that "Congress's use of expansive language in defining commercial sex act—using such terms as 'any sex act,' 'anything of value,' 'given to or received by any person'—requires a liberal reading." *Noble*, 335 F. Supp. 3d at 521; *see also Canosa v. Ziff*, 2019 WL 498865, at *22 n. 26 (S.D.N.Y. Jan. 28, 2019) (finding a "commercial sex act" includes receiving something of value such as career advancement in exchange for participating in coerced sexual activity) *and Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019) (holding that "TVPA extends to [the] enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual

42

or, as alleged here, non-consensual sexual activity.").

228.   However, the exchange of drugs for sex has been recognized as a "commercial sex act" for well over a decade. *Ditullio v. Boehm*, 662 F.3d 1091, 1095 (9th Cir. 2011); *see also Huett v. Weinstein Co. LLC*, 218CV06012SVWMRW, 2018 WL 6314159, at *3 (C.D. Cal. Nov. 5, 2018) (holding that a "commercial sex act" under the TVPRA need not "be an economic transaction" or otherwise involve a monetary "payment" so long as it involved "nonmonetary" benefits.)

229.   Thus, by using drugs and threats of violence to entice and coerce Plaintiff into performing sex acts in exchange for drugs and the promise of continued employment, Rangel engaged in and subjected Plaintiff to unlawful sex trafficking under the TVPRA.

230.   Additionally, by using a promise of career advancement at Subway to further entice and coerce Plaintiff into performing sex acts, Rangel engaged in and subjected Plaintiff to unlawful sex trafficking under the TVPRA.

231.   Additionally, by providing to Plaintiff "free" Subway food to which she was not entitled (enough food at times to share with her little siblings as well), Rangel engaged in and subjected Plaintiff to unlawful sex trafficking under the TVPRA.

232.   Rangel was an employee and/or agent of the Franchisee Defendants acting in the scope of his employment and/or authority when he engaged in the unlawful sex trafficking, such that the Franchisee Defendants are liable for his conduct.

233.   The Franchisor Defendants are, in turn, vicariously liable for the sex trafficking conduct of its agents, the Franchisee Defendants and Rangel.

234.    Further, in 2008, Congress amended the TVPRA to permit victims of sex trafficking to bring a civil action against not only the direct perpetrator of the trafficking but also certain beneficiaries of the trafficking. Pub. L. No. 108-193, 117 Stat. 2875 (2003).

235.    To establish beneficiary liability under the TVPRA, a plaintiff must show a defendant (1) "knowingly benefit[ted] financially or by receiving anything of value" (2) from participation in a venture that defendant "knew or should have known has engaged in" sex trafficking. *Lundstrom v. Holiday Hosp.* Franchising, LLC, No. 1:22-CV-056, 2023 WL 4424725, at *3 (D.N.D. May 22, 2023) (quoting 18 U.S.C. § 1595(a)).

236.    The Franchisee Defendants and Franchisor Defendants each knowingly benefited financially and/or received something of value from Rangel's sex trafficking of Plaintiff, which each of the Franchisee Defendants and Franchisor Defendants, through their respective employees or agents, knew or should have known was occurring.

237.    The Franchisor Defendants received revenue from royalties and other fees generated by the work of the Franchisee Defendants, including the continued work performed by Plaintiff in exchange for the commercial sex acts coerced by Rangel. *See Lundstrom*, 2023 WL 4424725, at *6 (holding that a hotel's "revenue generated from the ordinary course of business" was sufficient to support an allegation that a business "knowingly benefitted from alleged crimes because the revenue was derived from *all* operations.")

238.    The Franchisor Defendants knew or should have known about the sex trafficking, based on the physical presence of their agents involved in the regular close

inspection and oversight of the operations of the Subway store where the trafficking occurred, including but limited to Letcher, Brent Olson, Richard Olson, John Clark, and Peter Knoff.

239.   Likewise, the Franchisor Defendants knew or should have known about the sex trafficking, based on the physical presence of their agents involved in the regular close inspection and oversight of the operations of the Subway store where the trafficking occurred, including but limited to Letcher, Brent Olson, Richard Olson, John Clark, and Peter Knoff.

240.   For example, Plaintiff alerted Letcher that Plaintiff needed help and wanted to transfer stores or shifts, but Letcher, acting on behalf of the Franchisee Defendants and Franchisor Defendants and pursuant to the training and direction of the Franchisor Defendants, ignored Plaintiff's report.

241.   Accordingly, the Franchisee Defendants are directly liable for violation of the TVPRA.

242.   Similarly, the Franchisor Defendants are directly and indirectly liable for violation of the TVPRA.

243.   As a direct and proximate result of Defendants TVPRA violations, Plaintiff has suffered and continues to suffer loss of employment, pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

## COUNT II: CLAIM FOR NEGLIGENCE
### (Against All Defendants.)

244.    Plaintiff hereby incorporates all preceding paragraphs by reference.

245.    At all times material hereto, the Franchisor and Franchisee Defendants owed employees including Plaintiff a duty of reasonable care.

246.    The negligence, recklessness and/or other liability-producing conduct by Defendants, consisted of, *inter alia*:

a. Either (1) failing to adequately perform screening or background checks on Rangel prior to hiring him, where such screening and background checks would have revealed that Rangel was listed as a registered sex offender with the following description: "Rangel had sexual intercourse with a 19-year-old female while she was passed out. Rangle also forced a 14-year-old male and an 8-year-old female to perform oral sex on him on several occasions." (Had Subway conducted even a brief internet search, it would have found the aforementioned information); or (2) adequately performing screening/background checks on Rangel and then knowingly hiring a registered sex offender and known criminal pedophile.

b. Failing to adequately supervise Rangel, which resulted in him having unrestricted access to minor victims including Plaintiff;

c. Continuing to employ Rangel and allowing him to supervise underaged employees, including Plaintiff, when the Franchisor and Franchisee Defendants had information pertaining to Plaintiff's apparent discomfort with working with Rangel

and her request to be transferred to another Subway store or at least to another shift.

d. Failing to properly investigate or address Plaintiff's complaints of discomfort with continuing to work on the same shift with Rangel.

e. Systemically failing to properly address other employees' complaints of abuse, harassment, assault, sexual offenses, and/or unlawful activity;

f. Failing to publish and distribute adequate policies and procedures regarding sexual misconduct or assault and other misconduct, and the reporting thereof;

g. Failing to adequately train Plaintiff on how to identify, address, and report incidents of violence, sexual harassment, sexual assault and/or battery, and a sexually hostile or violent work environment.

h. Failing to adequately train Plaintiff on how to identify, address, and report incidents pertaining to drinking, drugs, and unknown illicit substances in the workplace (including when offered/given to her as a minor).

247. As a direct and proximate result of the Franchisor and Franchisee Defendants' negligence, Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

248. At all times material hereto, Defendants engaged in conduct and/or practices with reckless indifference or reckless disregard to the protected rights of Plaintiff to support an award of compensatory damages.

## COUNT III: CLAIM FOR NEGLIGENT HIRING
### (Against All Defendants.)

249.   Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

250.   The Franchisor and Franchisee Defendants owed employees, including Plaintiff, a duty of reasonable care, including a duty to conduct a reasonable level of pre-employment screening for potential employees and potential supervisors including Rangel, and to reasonably discover their dangerous propensities to sexually assault and batter minors, including female teenagers, and his history of doing so.

251.   The Franchisor and Franchisee Defendants did not exercise reasonable care in hiring Rangel.

252.   Rangel had propensities to sexually assault and batter children, minors, teenagers, and women and history of doing so.

253.   Rangel's dangerous propensities to sexually assault children and female teenagers, and his history of doing so, were reasonably discoverable, and were or would have been apparent to Defendants had they exercised reasonable care.

254.   The Franchisor Defendants and Franchisee Defendants  either (1) failed to conduct a reasonable level of pre-employment screening for potential employees and potential supervisors including Rangel, and consequently did not discover easily-obtained evidence regarding potential employees' and potential supervisors' including Rangel's propensities to sexually assault children and female teenagers; or (2) did discover Rangel's

propensities to sexually assault and batter children and minors, including female teenagers, and about his being a pedophile and a registered sex offender, and hired him anyway.

255.   As a result of the Franchisor and Franchisee Defendants' negligent hiring of Rangel, Plaintiff was assaulted, battered, drugged, raped, and otherwise harmed. Before and when Rangel assaulted, battered, and raped Plaintiff, Defendants knew or should have known through the use of ordinary care, of Rangel's reasonably discoverable propensities to sexually assault and batter minors, teenagers, and women and his history of doing so, and negligently placed Plaintiff in a position where Rangel would have access to potential victims including Plaintiff and/or where the threatened harm would come to pass.

256.   The above-referenced information pertaining to Rangel being a registered sex offender, which was reasonably available to the Franchisor and Franchisee Defendants, should have alerted a reasonable employer that Rangel posed a threat to Plaintiff and to other minor employees, including female employees.

257.   As a direct and proximate result of the Franchisor and Franchisee Defendants' actions, Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

258.   At all times material hereto, Defendants engaged in conduct and/or practices with reckless indifference or reckless disregard to the protected rights of Plaintiff to support an award of compensatory damages.

259.   The above-described acts of the Franchisor Defendants and Franchisee

Defendants constitute negligent hiring in violation of the law.

260.    The Franchisor Defendants are vicariously liable for the negligent hiring of Rangel by the Franchisee Defendants, which are agents of the Franchisor Defendants.

261.    Alternatively, the Franchisor Defendants are liable for the negligent hiring as joint employers of Rangel along with the Franchisee Defendants.

262.    Alternatively, the Franchisor Defendants are liable for the negligent hiring of Rangel because they, along with the Franchisee Defendants, constitute a single, integrated entity.

## COUNT IV: CLAIM FOR NEGLIGENT RETENTION
### (Against All Defendants.)

263.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

264.    When Rangel assaulted, battered, and raped Plaintiff, the Franchisor and Franchisee Defendants knew or should have known through the use of ordinary care, of Rangel's reasonably discoverable status as a sex offender and his propensities to sexually assault and batter minors, teenagers, and women and history of doing so, and negligently placed Plaintiff in a position where Rangel would have access to potential victims including Plaintiff and/or where the threatened harm would come to pass.

265.    The above-referenced information pertaining to Rangel being a registered sex offender, which was reasonably available to the Franchisor and Franchisee Defendants, alerted or should have alerted a reasonable employer that Rangel posed a threat to Plaintiff

and to other teenage/minor employees and female employees.

266.   The Franchisor and Franchisee Defendants were aware or should have been aware that Rangel was a danger to others—especially to minors—and that he was unfit for employment in close proximity to underage employees but continued to employ him anyway. The Defendants did not take corrective measures, such as investigating, or discharging Rangel.

267.   Even after Plaintiff informed the Franchisee Defendants that she felt uncomfortable working on the shift with Rangel and that she wanted to be transferred to another store or work a different shift where she would not have to interact with him or the close the store with him, Franchisee Defendants made no attempt to investigate why Plaintiff felt uncomfortable or take any measures to determine whether Rangel's behavior needed correction.

268.   As a direct and proximate result of the Franchisor and Franchisee Defendants' actions, Plaintiff has suffered significant physical injury resulting in part from being raped, and Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, mental anguish, physical pain, loss of enjoyment of life, and other non-pecuniary loss.

269.   At all times material hereto, Defendants engaged in conduct and/or practices with reckless indifference or reckless disregard to the protected rights of Plaintiff so as to support an award of compensatory damages.

270.   The above-described acts of Defendants constitute negligent retention in

violation of the law and Plaintiff's rights for which Defendants are liable.

271.    The Franchisor Defendants are vicariously liable for the negligent retention of Rangel by the Franchisee Defendants, which are agents of the Franchisor Defendants.

272.    Alternatively, the Franchisor Defendants are liable for the negligent retention as joint employers of Rangel along with the Franchisee Defendants,

273.    Alternatively, the Franchisor Defendants are liable for the negligent retention of Rangel because they, along with the Franchisee Defendants, constitute a single, integrated entity.

## COUNT V: CLAIM FOR NEGLIGENT SUPERVISION
### (Against All Defendants.)

274.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

275.    When Rangel assaulted, battered, and raped Plaintiff, the Franchisor and Franchisee Defendants knew or should have known through the use of ordinary care, of Rangel's reasonably discoverable propensities to sexually assault and batter minors, teenagers, and women and history of doing so, and negligently placed Plaintiff in a position where Rangel would have access to potential victims including Plaintiff and/or where the threatened harm would come to pass, and failed to reasonably supervise him.

276.    The above-referenced information pertaining to Rangel being a registered sex offender, which was reasonably available to the Franchisor and Franchisee Defendants, alerted or should have alerted a reasonable employer that Rangel posed a threat to Plaintiff

and to other teenage/minor employees and female employees, and yet Defendants failed to reasonably supervise him.

277.    The Franchisor and Franchisee Defendants were aware or should have been aware that Rangel was a danger to others—especially to minors—and that he was unfit for employment but continued to employ him without supervision.   The Franchisor and Franchisee Defendants did not take measures to ensure Rangel was adequately supervised when working with and supervising Plaintiff and other underage employees.

278.    As a direct and proximate result of the Franchisor and Franchisee Defendants' actions, Plaintiff has suffered significant physical injury including from being raped, and Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, mental anguish, physical pain, loss of enjoyment of life, and other non-pecuniary loss.

279.    At all times material hereto, Defendants engaged in conduct and/or practices with reckless indifference or reckless disregard to the protected rights of Plaintiff so as to support an award of compensatory damages.

280.    The above-described acts of the Franchisor and Franchisee Defendants constitute negligent retention in violation of the law and Plaintiff's rights for which Defendants are liable.

281.    The Franchisor Defendants are vicariously liable for the Franchisee Defendants' negligent supervision because the Franchisee Defendants are agents of the Franchisor Defendants.

282.    Alternatively, the Franchisor Defendants are liable for negligent supervision

as joint employers of Rangel along with the Franchisee Defendants,

283.    Alternatively, the Franchisor Defendants are liable for negligent supervision because they, along with the Franchisee Defendants, constitute a single, integrated entity responsible for the supervision of Rangel.

## COUNT VI: CLAIM FOR ASSAULT AND BATTERY
### (Against All Defendants.)

284.    Plaintiff incorporates by reference herein the preceding paragraphs in this Complaint.

285.    At all times material hereto, the Franchisor Defendants and Franchisee Defendants, collectively and individually, had a duty to maintain a work environment free of assault and battery.

286.    During each occasion enumerated above, Plaintiff was placed in apprehension of imminent harmful or offensive contact with Subway Shift Supervisor Rangel's person, which created a reasonable apprehension of a battery.

287.    During each occasion enumerated above, Plaintiff was subject to an unwanted touching, which was not consented to (and could not be due to Plaintiff's minor age), excused, or justified.

288.    The acts of Rangel constitute assault and battery under the law of North Dakota.

289.    The acts of the Franchisor Defendants and Franchisee Defendants, through their agent and employee, constitute assault and battery under the law of North Dakota, for

which the Defendants are liable under the theory of *respondeat superior* or otherwise under North Dakota law.

290.     Alternatively, Defendants are also all liable as joint employers and/or as a single, integrated entity and enterprise.

291.     As a direct and proximate result of the Franchisor and Franchisee Defendants' actions, Plaintiff has suffered and will continue to suffer physical pain and physical harm, financial harm, inconvenience, fear, humiliation, mental anguish, and emotional pain.

### COUNT VII: CLAIM FOR SEXUAL ASSAULT
### (Against All Defendants.)

292.     Plaintiff incorporates by reference herein all the preceding paragraphs in this Complaint.

293.     During each occasion enumerated above, then-seventeen-year-old Plaintiff (a minor) was placed in apprehension of imminent harmful or offensive contact with Subway Shift Supervisor Rangel's person, which created a reasonable apprehension of sexual assault.

294.     During each occasion enumerated above, Plaintiff was subject to sexual assault, which was not consented to (and could not be consented to, due to Plaintiff's minor age), excused, or justified.

295.     The acts of Rangel constitute sexual assault under the law of North Dakota.

296.     The acts of the Franchisor and Franchisee Defendants through their agent

and employee, constitute sexual assault under the law of North Dakota, for which Defendants are liable under the theory of *respondeat superior* or otherwise under North Dakota law.

297.   Defendants are also liable under the integrated employer/enterprise doctrine.

298.   As a direct and proximate result of the Franchisor and Franchisee Defendants' actions, Plaintiff has suffered and will continue to suffer physical harm and physical pain, financial harm, fear, humiliation, and mental anguish.

### COUNT VIII: FALSE IMPRISONMENT
**(Against All Defendants.)**

299.   Plaintiff incorporates by reference herein the preceding paragraphs in this Complaint.

300.   During Plaintiff's employment at the Subway restaurant operated and controlled by Defendants, Plaintiff, as a result of and during Rangel's sexual assaults of Plaintiff, was physically and unlawfully restrained.

301.   Specifically, Rangel physically trapped Plaintiff in a bathroom at the Subway store where he and Plaintiff worked in order to rape her.

302.   Rangel also physically trapped Plaintiff in his bedroom in his home— as a result of Defendants' requiring Plaintiff to take Shift Supervisor Rangel home as part of her job duties on the closing shift—in order to rape her.

303.   Rangel's unlawful restraint of Plaintiff's person occurred at the Subway restaurant operated and controlled by Defendants, while Rangel was acting as an employee and/or agent of Defendants.

304.   Rangel's further unlawful restraint of Plaintiff's person occurred at Rangel's home as a result of Defendants' requiring Plaintiff to take Rangel home as part of her job duties on the closing shift, while Rangel was acting as an employee and/or agent of Defendants.

305.   Rangel's unlawful restraint of Plaintiff constitutes false imprisonment under North Dakota Law.

306.   As a direct and proximate result of the false imprisonment, Plaintiff has suffered and will continue to suffer physical harm and physical pain, financial harm, fear, humiliation, and mental anguish.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff C.S. demands judgment against the Franchisor Defendants and Franchisee Defendants for injunctive and equitable relief, and monetary damages in an amount in excess of $50,000,000, together with pre-judgment interest and for costs and attorney's fees to the extent recoverable by law, and for such other and further relief as may be just and equitable. Plaintiff places Defendants on notice of her intent to seek leave of Court to amend this Complaint to include a claim for punitive damages.

## JURY DEMAND

Plaintiff demands trial by jury on all issues that may be tried before a jury, including arbitrability of any claim.

WOLD JOHNSON, P.C.

Dated: February 22, 2024

*/s/Benjamin E. Thomas*
Benjamin E. Thomas (ND # 04713)

*/s/Mark A. Beauchene*
Mark A. Beauchene (ND # 03546)

500 Second Avenue North
Suite 400
P.O. Box 1680
Fargo, North Dakota 58107
Telephone: (701) 235-5515
bthomas@woldlaw.com
mbeauchene@woldlaw.com

HALUNEN LAW

*/s/Brittany Deane Salyers*
Brittany Deane Salyers (MN #0396239)*
Pamela A. Johnson (MN #0269667)*
Kyle P. Hahn (MN #0399588)*
Paul M. Schinner (WI #1093983)*
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
p.johnson@halunenlaw.com
salyers@halunenlaw.com
hahn@halunenlaw.com
schinner@halunenlaw.com
*Pro Hac Vice Motion Forthcoming*

*ATTORNEYS FOR PLAINTIFF*