IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| C.S., an individual, | ) | |
| | ) | |
| | ) | Case No.: 3:24-CV-31 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| SUBWAY WORLDWIDE, INC., | ) | |
| DOCTOR'S ASSOCIATES LLC, | ) | |
| SUBWAY IP LLC, FRANCHISE | ) | **MEMORANDUM OF LAW IN** |
| WORLD HEADQUARTERS, LLC, GRB | ) | **OPPOSITION TO FRANCHISOR** |
| INVESTMENTS, LLC, GRB SUBWAY | ) | **DEFENDANTS' MOTION TO** |
| PROPERTIES LLP and, MIDWEST | ) | **DISMISS** |
| SUBWAY DEVELOPMENT, LLP | ) | |
| (all Defendants collectively d/b/a | ) | |
| "Subway") | ) | |
| | ) | |
| Defendants. | | |

Plaintiff C.S., by and through her attorneys, respectfully submits this Memorandum

Law in Opposition to Defendants Subway Worldwide, Inc., Doctor's Associates LLC,

Franchise Word Headquarters, LLC, and Subway IP LLC's joint Motion to Dismiss.

Dated: April 5, 2024         HALUNEN LAW
                             Attorneys For Plaintiff C.S.
                             */s/ Brittany Deane Salyers*
                             Brittany Deane Salyers (MN #0396239)*
                             Pamela A. Johnson (MN #0269667)*
                             Kyle P. Hahn (MN #0399588)*
                             Paul M. Schinner (WI #1093983)*
                             Halunen Law
                             1650 IDS Center
                             80 South Eighth Street
                             Minneapolis, MN 55402
                             Telephone: (612) 605-4098

Facsimile: (612) 605-4099
p.johnson@halunenlaw.com
salyers@halunenlaw.com
hahn@halunenlaw.com
schinner@halunenlaw.com
*Admitted Pro Hac Vice

# **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................. 1

II.    PLAINTIFF'S WELL-PLEADED FACTS.................................................. 3

III.   MOTION TO DISMISS STANDARD ....................................................... 8

IV.    ARGUMENT ................................................................................. 9

   A.   Plaintiff's Complaint Satisfies Fed. R. Civ. P. 8(a) ........................................ 9

   B.   Plaintiff States a Plausible TVPRA Claim .................................................. 15

     1.  Plaintiff Sufficiently Pleads Beneficial Participation in a "Venture" ...... 15

     2.  Plaintiff Sufficiently Pleads Defendants "Knew or Should Have Known"
       17

   C.   Plaintiff Plausibly Alleges an Agency Relationship & Vicarious Liability  21

   D.   Plaintiff Plausibly Alleges Joint Employer Status and Direct Liability ...... 27

V.     CONCLUSION ............................................................................. 30

# I.     INTRODUCTION

Plaintiff was sexually assaulted by her supervisor while she was a teenager employed at a Subway restaurant. Asserting claims against both the Subway franchisee and franchisor, Plaintiff alleges that her abuser was hired and assigned to supervise her despite his being a registered sex offender with a history of violence against children. His then-recent release from prison, conviction record, and presence in the community were well-known to the public—including agents of both the franchisee and franchisor. Plaintiff also details the relationship, role, and motive of four intertwined sister entities (the "Franchisor Defendants") in exercising "intense oversight and control" of the franchise.  Plaintiff further describes how the Franchisor Defendants perpetuated a top-down culture, pattern, and practice of turning a blind eye to predatory behavior. This culture and practice were promoted and implemented by executives responsible for mandatory training as well as foot soldiers and middle managers involved in day-to-day franchise operations. These extensive allegations of knowledge and control put each of the Franchisor Defendants on notice of the multiple bases for their respective liability sufficient to overcome their jointly filed Motion to dismiss.

Nonetheless, the Franchisor Defendants attempt to deflect liability by pointing to the franchisee as the sole responsible party. For example, citing excerpts and preferred interpretations of what they claim is the operative franchise agreement and related material, the Franchisor Defendants argue the franchisee was sufficiently "independent" to preclude the existence of any agency relationship. Along the same lines, the Franchisor Defendants

assert that they had "no dealings with Plaintiff"; no "direct or indirect" knowledge of or role in the crimes; and "no rights or role whatsoever as to the franchisee's employment decisions." ECF 10 at 8.

The problem for the Franchisor Defendants, at this stage, is that Plaintiff's Complaint alleges precisely the opposite. Specifically, each argument runs squarely into well-pleaded factual allegations regarding the Franchisor Defendants' connection to, control of, involvement in, and knowledge of the franchise operations at issue. Case law addressing similar franchisor liability claims further highlights the instant motion's prematurity.

Indeed, disputes regarding the nature and extent of a franchisor's control over a franchisee are fact-intensive and usually addressed only after discovery. *See generally Dakota Metal Fabrication v. Parisien*, 3:22-CV-174, 2023 WL 3344277, at *3 (D.N.D. May 10, 2023) (Welte, C.J.) (denying motion to dismiss in tribal exclusion doctrine case and reasoning that similar claims "are nearly uniformly resolved on summary judgment"); *see e.g. Smith v. JEENS, Inc.*, 566 F. Supp. 3d 941, 946 (S.D. Iowa 2021) (denying franchisor's motion and reasoning that "determining the level of control, actual existence of a joint employer relationship, or agency relationship in the alternative, is a material question of fact dependent on discovery and development of the factual record."); *Johnson v. McDonald Corp.*, 542 F. Supp. 3d 888, 891 (E.D. Mo. 2021)(denying (b)(6) motion where plaintiff alleged franchisor "conducted frequent inspections of the franchise", strictly enforced McDonald's standards, and "provided guidance about employee training"); *Gray v. McDonald'S Corp.*, 2:10-CV-2779-JPM-TMP, 2011 WL 13116678, at *8 (W.D. Tenn.

Mar. 14, 2011) ("Plaintiffs allege sufficient facts that McDonald's exercised control over the aspects of the restaurant that resulted in Gray's injuries"); *and Myers v. Garfield & Johnson Enters., Inc.*, 679 F. Supp. 2d 598, 612 (E.D. Pa. 2010)(denying franchisor motion to dismiss and reasoning that "[w]hether a franchisor exercises sufficient control to be held liable depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties.") (quotation omitted).

## II.      PLAINTIFF'S WELL-PLEADED FACTS

In June 2022, Plaintiff, then a teenager in high school, commenced employment as a sandwich artist at a Subway restaurant in Jamestown, North Dakota. ECF 1, ¶ 131. The decision to hire Plaintiff was made by the restaurant's general manager (GM), Mariann Letcher, who interviewed Plaintiff and asked Plaintiff if she could pass a background check. *Id.* ¶¶ 129-130. Plaintiff was assigned two "closing" shifts, 4:30 p.m. to 9:00 P.M. on weekdays and 12:00 to 9:00 PM on weekends. *Id.* ¶¶ 131-137. Carlos Rangel was Plaintiff's direct supervisor on her assigned shifts. *Id.*

At the time he was hired to work at the Jamestown Subway restaurant, 52-year-old Rangel was a registered sex offender, with a conviction record that included sexual assault against children and teenagers. *Id.* ¶ 122. Shortly before he was hired, Rangel had been released from prison and was the subject of a widespread public safety warning issued to the public by the Police. *Id.* ¶¶ 123-226.  The warning specified Rangel's history of violent sex crimes and noted that the North Dakota Attorney General's office had assessed him as a "high risk" offender. *Id.* Nonetheless, Rangel was assigned to supervise Plaintiff, who

worked under him alongside two male coworkers who were also registered sex offenders. *Id.* ¶¶ 142-146.

Throughout the next five months, including during Plaintiff's assigned shifts, Rangel sexually assaulted Plaintiff; drugged Plaintiff; threatened Plaintiff with violence; used his status as a Subway supervisor to pressure Plaintiff into sex acts; forced Plaintiff to take a pregnancy test to confirm the success of a forced miscarriage of a post-rape pregnancy; exchanged Subway food for sex acts; gave Subway food to third-parties as part of drug transactions; and used the restaurant as a place to house and take delivery of drugs which he then coerced Plaintiff to take on a near daily basis in exchange for additional sex acts. *Id.* ¶¶ 168-169, 171-182; 189-91. The GM, Letcher, knew of this conduct and/or ignored several red flags. *Id.* ¶¶ 141-143; 186-187; 197-202; 238. Instead of protecting Plaintiff from Rangel, she told Plaintiff that Rangel was considered a valuable, dependable, "star" employee. *Id.* ¶ 137.

GM Letcher was not the only person with knowledge of, control over, or responsibility for relevant aspects of Plaintiff's work environment, such as human resources (HR) practices and procedures; workplace safety; or the hiring and supervision of Rangel. *Id.* ¶¶ 33-41; 59.  Indeed, the franchise where Rangel assaulted Plaintiff is owned and co-managed through three closely related business entities: Midwest Subway Development, LLP; GRB Investments, LLP; and GRB Subway Properties, LLP. *Id.* ¶¶ 33-41. Acting in concert and through their common owners and managers Brent Olson and John Clark, these entities (the "Franchisee Defendants") were responsible for the safety of

4

the restaurant work environment as well as the hiring and supervision of Letcher and Rangel. *E.g. id.* ¶¶ 60, 100, 141-42.

Olson, Clark, and the Franchisee Defendants were not alone or acting solely on behalf of themselves with respect to their knowledge of, control over, and responsibility for relevant aspects of Plaintiff's work environment, including HR practices and procedures, and the hiring and supervision of Letcher and Rangel. Specifically, four closely related entities responsible for overseeing and operating the franchise with Clark, Olson, and the Franchisee Defendants also had knowledge as well as ultimate control and authority over the day-to-day operations of the restaurant. *Id.* ¶¶ 42-58. These entities include Subway parent company Subway Worldwide Inc. (SWI) and three of its many subsidiaries: Doctor's Associates, LLC (DAL); Subway IP, LLC; and Franchise World Headquarters, LLC (the Franchisor Defendants). *Id.* ¶¶ 42-60. Operating together, from the same headquarters and through common managers, executives, policies and practices, the Franchisor Defendants were each engaged, individually and in concert with each other and the Franchisee Defendants, in the direction, control and oversight of franchisee operations, including the operations of the restaurant at issue. *Id.* ¶¶ 43, 51, 54-58. This direction and control extended to the following policies and practices relevant to the circumstances that resulted in Plaintiff's assault:

- HR policies and practices;

- workplace safety policies and practices;

- enforcement of workplace rules and codes of conduct;

- hiring, training and supervision of restaurant managers, shift supervisors, and

crew members; and

- the physical work environment.

*Id.* ¶¶ 60. The Franchisor Defendants were responsible for designing and providing mandatory training to the franchise regarding the hiring and supervision of restaurant managers and supervisors. *Id.* ¶ 61. In doing so, the Franchisor Defendants, intentionally minimized the amount and quality of training given to the Franchisee Defendants with respect to sexual harassment and assault reporting and investigation. *Id.* ¶¶ 15-16, 78-84. For example, the mandatory training provided by the Franchisor Defendants spends 24 hours on "Sandwich Artistry, POS, Guest Services & Thru-Put, and Sales/Inventory Reporting," and a mere 1 hour on "Recruiting & Hiring, Developing Staff." *Id.* ¶ 81. Further, the Employee Training Manual designed and implemented by the Franchisor Defendants directed employees like Plaintiff who "happen to have an issue with the manager or with a particular employee" to "try to get along with them in order to maintain a pleasant atmosphere." *Id.* ¶ 154.

Olson and Clark were both Business Development Agents (BDAs) of the Franchisor Defendants. As such, they were the Franchisor Defendants' "eyes, ears, and arms and primary representatives in the field." *Id.* ¶ 98. In this capacity, Olson and Clark, acting individually as well as through subordinates like Letcher, were akin to regional executives, providing oversight and control of day-to-day franchise operations on behalf of the Franchisor Defendants, and ensuring implementation of the HR policies and procedures designated by the Franchisor Defendants. *Id.* ¶¶ 99-100. The oversight and control exercised by Olson and Clark were exercised on behalf of, at the direction of, and in

exchange for compensation from the Franchisor Defendants, who acted through common managers and executives based in their shared headquarters. *Id.* ¶¶ 56, 99. Olson, Clark and the subordinates and entities they control were all "part of the Franchisor Defendants' centralized chain of command." *Id.* ¶¶ 102-103.

Plaintiff also alleges that Olson and Clark were not the only agents through which the Franchisor Defendants exercised oversight and control of the restaurant at issue. In addition to BDAs, the Franchisor Defendants employed field consultants, trainers, auditors, HR professionals, and others to engage on their behalf directly with the restaurant. *Id.* ¶¶ 13, 60, 77, 90-91, 101-102, 239. These agents of the Franchisor Defendants were responsible for providing regular, close inspection and oversight of the operations of the Subway restaurant where Plaintiff was repeatedly assaulted over a period of 5 months. *Id.* Like the BDAs, these agents took their direction from and reported to regional and executive-level management. *Id.* ¶¶ 77, 100-103, 238. For example, employment and HR policies and practices as well as related training were ultimately the responsibilities of the Franchisor Defendants' Chief HR Officer Lisa Shea and Manager of Global Learning & Development Nicole Miscensik. *Id.* ¶¶ 76-80.

Finally, the above-described individuals, acting on behalf of the Franchisor Defendants, carried out their instructions regarding oversight and control of the restaurant with the actual and apparent authority granted to them by the Franchisor Defendants and by "wielding" the leverage of the operative franchise agreement. Generally, the Franchisor Defendants' franchise agreements provide the Franchisor Defendants with extensive authority over franchise operations. *Id.* ¶¶ 85-93. Specifically, this authority includes not

only the broad right to terminate the franchise agreement but also the right to enter and inspect the franchise at any time and to enforce an extensive set of detailed operational requirements, including but not necessarily limited to those set forth in a voluminous "operations manual." *Id.* Further, the Franchisor Defendants' control extended to being able to replace individual managers. *Id.* ¶ 93.

## III.   MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 8(a) requires a pleading only to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts as true the factual allegations in the complaint" and draws "all reasonable inferences in the plaintiff's favor." *Dakota Metal* 2023 WL 3344277, at *3 (citing *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014)). "In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss." *HealthPartners, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 587 F. Supp. 3d 874, 879 (D. Minn. 2022) (citing Fed. R. Civ. P. 12(d) and *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 948 (8th Cir. 1999)).

On a motion to dismiss, a "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *FastTrac Transportation, LLC v. Pedigree Techs., LLC*, 618 F. Supp. 3d 858, 863 (D.N.D. 2022)(Welte, C.J.) (quoting *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 371-72 (8th Cir. 2017)). "The burden is on the moving party to prove that no legally cognizable claim

for relief exists." *Id.* To sufficiently state a plausible claim, a plaintiff "does not need detailed factual allegations." *Axelsson v. Univ. of N. Dakota Sch. of Med. & Health Scis.*, 3:22-CV-00056, 2022 WL 3682225, at *4 (D.N.D. Aug. 25, 2022)(Welte, C.J). Rather, a complaint need only "state a claim to relief that is plausible on its face." *Twombly*, 551 U.S. at 570.

## IV.    ARGUMENT

### A.  Plaintiff's Complaint Satisfies Fed. R. Civ. P. 8(a)

The Franchisor Defendants argue that Plaintiff has violated Fed R. Civ. P. 8(a) by failing to "specifically" plead which "specific wrongdoing" each Franchisor entity is respectively responsible for.  ECF 10 at 20. This argument fails for three overlapping reasons. First, it conflates the notice pleading standard with the heightened "particularity" standard of Fed. R. Civ. P. 9(b). Second, it ignores detailed context provided in the Complaint regarding the Franchisor Defendants' joint control of the franchise. Third, it hinges on disputed assertions about the relationships of the parties, turning the motion to dismiss standard on its head by asking the Court to assume facts and draw inferences in *Defendants'* favor, rather than the non-movant's.

The purpose of Fed. R. Civ. P. 8 "is to give notice to the other party and not to formulate issues or fully summarize the facts involved." *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388, 390 (8th Cir. 1968). Allegations that "Defendants" collectively "committed the misconduct alleged in a complaint" sufficiently provide such notice where "the allegations indicate that each defendant could be liable for any of the

allegations in the complaint." *Watkins v. Algoa Corr. Facility Missouri Dep't of Corr.*, 2:21-CV-04166-NKL, 2022 WL 452476, at *2 (W.D. Mo. Feb. 14, 2022). Such allegations suffice at the pleading stage, because a "plaintiff will often be unable to prove definitively the elements of the claim before discovery, particularly in cases where the necessary information is within the control of the defendants." *Ash v. Anderson Merchandisers*, LLC, 799 F.3d 957, 961 (8th Cir. 2015); *see also Weslease 2018 Operating LP v. Behan*, 1:19-CV-157, 2019 WL 11638953, at *2 (D.N.D. Oct. 21, 2019) (denying motion to strike and reasoning that "collective allegations seem inevitable considering Plaintiff's claim that all three defendants were jointly and severally liable").

Generally, "evaluation of a complaint upon a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir.2009) (quoting *Iqbal*, 129 S.Ct. at 1950). "The degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247-48 (10th Cir. 2008) (discussing *Twombly*, 127 S.Ct. at 1970–71 n. 10). For example, a complaint alleging fraud is subject to a heightened pleading standard under which facts must be "stated with "particularity", i.e. they must specify "the 'who, what, where, when, and how' of the alleged fraud" *FastTrac Transportation, LLC v. Pedigree Techs., LLC*, 618 F. Supp. 3d 858, 870 (D.N.D. 2022) (Welte, C.J.) (denying motion to dismiss breach of contract claims but granting motion to dismiss fraud claims) (quotations omitted).

Here, none of Plaintiff's claims fall under that heightened standard. *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) (holding that negligence claims are not subject to Fed. R. Civ. P. 9(b)). But even if they were subject to the heightened standard, Plaintiff might very well meet it. Indeed, the detailed factual basis for the Franchisor Defendants' direct and vicarious liability on each count goes well beyond the facts required by Fed. R. Civ. P. 8(a) by providing much of the who, what, where, when, how, and why of the Franchisor Defendants' tortious conduct as well as their agency relationship with the Franchisee Defendants.

First, the Complaint specifies each Franchisor Defendant entity's respective role in franchise operation and relationship to each of its co-Defendants. It then describes how these entities, acting in concert via common management, policies and practices, jointly operate franchisees through specific actions of common agents receiving direction from a common headquarters. For example, the Complaint identifies by name two of the executives responsible for the design and implementation of the mandatory training provided to franchisees regarding HR practices and policies. The Complaint further specifies the negligently inadequate nature of the training as well as the Franchisor's dual cost-saving and brand-protecting motive for providing negligent training while turning a blind eye to the results. ECF 1. ¶¶ 8-11, 15-16, 107.

Next, the Complaint names the two BDAs at issue and describes their role as agents through whom the Franchisor Defendants exercised oversight and control of franchise operations. In addition to the BDAs, the Complaint details how the Franchisor Defendants use additional consultants and inspectors to closely monitor franchisee operations and

ensure adherence to prescribed standards, policies and practices. Further, the Complaint specifically alleges that the Franchisor Defendants, through the presence and involvement of these agents, knew or should have known of Plaintiff's assaults and the specific cause and circumstances thereof—e.g., the hiring and assignment of a convicted sexual predator to work in a position of authority over a minor, without sufficient supervision, alongside two other sex offenders in a restaurant with a security camera that was either inoperable or unused. *Id.* ¶¶ 134-146.

Finally, the Complaint illustrates how the above-described oversight and control are facilitated by the economic reality of the Franchisor Defendants' relationship with franchisees. Specifically, the Complaint describes how the Franchise Agreement provides the Franchisor Defendants unfettered access to the franchisees' operations as well as actual and apparent authority to enforce franchisees' implementation of a broad swath of operational requirements, including those related to workplace safety and employment practices. *Id.* ¶¶ 85-93. The Complaint notes that while Defendant DAL is the entity that executes and signs these agreements, DAL does so on behalf of its co-Defendants, including its parent company, Defendant SWI, and its two sister companies, Defendants SIP and FWH. *Id.* ¶ 47.

In naming these four entities as the "Franchisor Defendants," Plaintiff was selective. As the Complaint states, the Subway Franchise System is a global business and one of the largest fast-food employers in the United States. *Id.* ¶¶ 7, 43. Its corporate structure includes multiple holding companies, which Plaintiff did not name. *Id.* ¶¶ 48, 52, 55. The operationally intertwined roles of Defendants DAL, SIP, and FWH and their respective

parent company, SWI, is set forth in Subway's Franchisee Disclosure Statement, recent versions of which are publicly available online and include details of the Franchisor Defendants' operational roles and corporate affiliations as well as copies of Subway's standard Franchise Agreements. *See, e.g. Franchise Disclosure Statement*, Subway, April 25, 2022, *available at* https://www.restfinance.com/app/pdf/fdd/Subway-2021.pdf [accessed April 1, 2024].

Accordingly, the Complaint reflects the *opposite* of a "shotgun" or "kitchen sink" approach. It provides more than the necessary context to justify grouping the Franchisor Defendants.  Plaintiff has therefore satisfied Fed. R. Civ. P. 8. *See, e.g. Kruger v. Lely N. Am., Inc.*, 518 F. Supp. 3d 1281, 1293 (D. Minn. 2021) ("When multiple defendants are members of the same corporate family, are wholly owned subsidiaries, and share counsel, the defendants should be able to sort out amongst themselves who is responsible for the allegedly fraudulent behavior.") *and Roberts v. Cnty. of Riverside*, EDCV191877JGBSHKX, 2020 WL 3965027, at *3 (C.D. Cal. June 5, 2020) ("[W]hen a group of defendants is small, closely related, or engaged in the same wrongful conduct, group pleading can be sufficient to offer fair notice of the wrongs alleged."); *see also DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, 2018 WL 10247483, at *15 (N.D. Cal. Sept. 24, 2018) (finding collective allegations against four Uber-related entities who were corporate affiliates and who participated in the same alleged wrongful conduct sufficient to provide fair notice) *and Northstar Mgmt., Inc. v. Vorel*, No. CIV-19-260-SLP, 2019 WL 7753449, at *2 (W.D. Okla. Nov. 20, 2019) (rejecting the argument that collective allegations failed to distinguish between the actions taken by the individual member and LLC defendants,

13

because the complaint provided the relevant context and the case was not one in which wrongful acts were alleged against multiple individual defendants, as is common in § 1983 cases).

In contrast to those cited above, the only case the Franchisor Defendants cite in support of their "shotgun pleading" argument—*Gurman v. Metro Hous. & Redevelopment Auth.*—is clearly distinguishable. F. Supp. 2d 1151, 1153 (D. Minn. 2011). Indeed, the Franchisor Defendants tellingly omit how the court defined "'kitchen sink or shotgun' complaints" as "complaints in which a plaintiff brings every conceivable claim against every conceivable defendant." *Id.* In *Gurman*, the complaint at issue was "littered with frivolous claims" and included "17 different claims… against all 13 defendants (3 of whom are unnamed)." *Id.* While the Franchisor Defendants may take issue with the length of the introduction section or the overlapping nature of certain counts as a matter of stylistic criticism, Plaintiff's Complaint satisfies Fed. R. Civ. P. 8 and bears no resemblance to the complaint in *Gurman*.

Lastly, it appears that what the Franchisor Defendants truly take issue with is not the length, format or style of the Complaint, or even the specificity of the allegations. Rather, they simply claim to disagree with the truth of certain allegations. For example, as part of its shotgun pleading argument, the Franchisor Defendants assert that Defendant DAL has "no contractual relationships at all with any other party" and that certain unspecified defendants "have no connection to the key agreements." ECF 10 at 20-21. But even if these assertions were better explained or supported by a declaration (they are not),

these are summary judgment or trial arguments that cannot and do not undercut the sufficiency of Plaintiff's pleading under Fed. R. Civ. P. 8 or 12(b)(6).

### B.   Plaintiff States a Plausible TVPRA Claim

To state a claim against the Franchisor Defendants under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Plaintiff must plausibly allege "facts from which it can be reasonably inferred" that the Franchisor Defendants (1) "'knowingly benefitted financially or by receiving anything of value' (2) from participation in a venture that defendant 'knew or should have known' has engaged in sex trafficking." *Lundstrom v. Holiday Hosp. Franchising, LLC*, 1:22-CV-056, 2023 WL 4424725, at *3 (D.N.D. May 22, 2023) (quoting 18 U.S.C. § 1595(a)). The Franchisor Defendants argue that Plaintiff has failed to plead either element. In keeping with their overarching assertion that the franchise and BDAs were "independent," the Franchisor Defendants do not dispute Plaintiff has adequately plead that her supervisor sex trafficked her by coercing her into exchanging sex for things of value.

### 1.   Plaintiff Sufficiently Pleads Beneficial Participation in a "Venture"

Because the TVPRA is a remedial statute, its terms—such as "anything of value" and "participation in a venture"—must be broadly construed. *Peyton v. Rowe*, 391 U.S. 54, 65, 88 (1968). The TVPRA defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(5). The "venture" in which a defendant both participates and benefits "does not need to be focused on sex trafficking." *Treminio v. Crowley Mar. Corp.*, 322CV00174CRKPDB, 2023 WL 8627761, at *10 (M.D. Fla. Dec. 13, 2023). Rather, the "venture" is the "business itself under the

TVPRA, rather than the facets of the business that were involved with sex trafficking." *Id.* (citing *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (holding that plaintiff "sufficiently alleged the existence of a venture that violated" the TVPRA and reasoning that "[t]he text of Section 1595 does not say 'sex-trafficking venture,' but only 'venture.'")); *see also S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020) (holding that TVPRA venture-participation liability does not require "participation in the sex trafficking act itself," reasoning that such a requirement would "void" the statute's "'knew or should have known' language'" and collecting cases rejecting similar arguments).

Here, Plaintiff has clearly pleaded the first element, i.e., that the Franchisor Defendants knowingly benefited from their "venture" with the Franchisee Defendants. For example, in addition to detailing the Franchisor Defendants' individual and collective roles in the operation of the franchise at issue, Plaintiff alleged that the revenues generated by the operations "of the Subway store where Plaintiff worked…flowed to both the Franchisee Defendants and the Franchisor Defendants." ECF 1, ¶ 142. Plaintiff also specified the Franchisor Defendants' financial motive for enabling and tolerating the sex trafficking as well Rangel's role in the venture as a supervisor deemed "exceptionally valuable" and "dependable." *Id.* ¶¶ 9, 15-16 136-139.

Nothing in the text of the TVPRA limits "venture" liability to contract signatories. Nor does the applicable pleading standard require Plaintiff to further specify precisely when and how revenues and royalties reached or benefited each Franchisor Defendant. This would unreasonably require Plaintiff to have access to the parties' bank accounts and

financial statements. Moreover, it is sufficient that Plaintiff specifically plead how the Franchisors benefited from the work performed by Plaintiff and Rangel. *Id.* ¶ 237; *see also Treminio*, 2023 WL 8627761, at *10 (denying summary judgement motion where defendant's profit-generating business "benefited" from the trafficker and his victim's "employment and their help in growing the [defendant]'s business"; and finding that "[w]hether [the sex trafficker] used the mutual business venture he engaged in with [defendant] to his advantage or acted in concert with [defendant] employees to then sex traffic Plaintiff is a question for a jury.")

### 2. Plaintiff Sufficiently Pleads that Defendants "knew or should have known"

To hold a defendant liable for benefiting from a business venture that violated the TVPRA, a plaintiff must plausibly plead that the defendant "knew or should have known" of the acts constituting the TVPRA violation. 18 U.S.C. § 1595(a). This element can be met by pleading facts supporting an inference of knowledge, which can be "actual or constructive." *Treminio*, 2023 WL 8627761, at *8 (citations omitted). "Knowledge" can be defined as "[a]n awareness or understanding of a fact or circumstance" and "constructive knowledge" as "[k]nowledge that one using reasonable care or diligence should have, and therefore is attributed by law to a given person." *Id.* (quoting Black's Law Dictionary (11th ed. 2019). Pleading that a defendant "should have known" does not require a plaintiff to allege facts rising to the level of "reckless disregard" or "actual knowledge or conspiracy between Defendants and the trafficker." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 966 (S.D. Ohio 2019); *see also Faragher v. City of Boca Raton*, 524 U.S.

775, 807-808 (identifying Title VII's "knew or should have known" standard as a negligence standard).

In *Lundstrom*, the court assessed the sufficiency of a TVPRA plaintiff's knowledge allegations by considering "two cases that represent the ends of the spectrum on TVPRA civil liability, *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) and *Lawson v. Rubin*, 2018 WL 2012869, 2018 U.S. Dist. LEXIS 71582 (E.D.N.Y. Apr. 29, 2018)." 2023 WL 4424725, at *7. In *Ricchio*, the defendant business's owner was alleged to have given "high fives" to the sex trafficker, alluded to a past sex trafficking business relationship with the trafficker, and observed the trafficker violently prevent the plaintiff's escape attempt. *Id.* The court reasoned that *Ricchio* represented "the heinous end of the spectrum" while *Lawson* represented the opposite end, as that case involved a condo owner with no alleged reason whatsoever to know he had leased the condo to a sex trafficker. *Id.*

Applying this "spectrum" analysis, the *Lundstrom* court granted the motion to dismiss because the plaintiff only alleged that the hotel franchisor was aware of "the prevalence of sex trafficking generally at its hotels" and thus had no direct knowledge or reason to know of Plaintiff's specific circumstance. *Id.* at *8. As for indirect knowledge through its franchisee's employees, the court granted dismissal because the complaint included only "a blanket statement" seeking to "connect the franchisor-franchisee relationship to actual agency" and did not allege "control over the day-to-day operations of the franchisee's business." *Id.* at *9 (quotations omitted).

In *M.A. v. Wyndam*, also a hotel-franchise TVPRA case, the court used the same "spectrum" analysis later used in *Lundstrom* based on the same two cases. 425 F. Supp. 3d

at 966. As in *Lundstrom*, the court found that "Plaintiff's claims in this case fall somewhere between *Ricchio and Lawson*." *Id.* However, the court reached the opposite conclusion as the *Lundstrom* court, denying the motion to dismiss and reasoning that "[s]everal courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence." *Id.* at 968 (noting the sufficiency of "willful blindness" allegations, citing *Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009) and *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007). The court also found a sufficiently alleged agency relationship and joint employer status, because, on top of its legal conclusions, the complaint detailed the franchisor's control over "employee training, standardized or strict rules of operation, the prices that the hotels could charge" as well as the "regular inspection" and "operation" of the hotels at issue. *Id.* at 971-72; *see also S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1258 (M.D. Fla. 2020) (denying motion to dismiss where plaintiff alleged that hotel franchisor "exercised control over the means and methods of how its franchisees conducted business in a variety of ways, such as profit sharing, standardized training, standardized rules of operation, regular inspection, and price fixing" and collecting four cases reaching similar conclusion).

Here, with respect to the "knew or should have known" element, Plaintiff's Complaint resembles those that passed muster in *M.A. v. Wyndam* and *S.Y. v. Naples Hotel Co.* more than those dismissed in *Lundstrom* and *Lawson*. For example, rather than relying solely on a "blanket statement," Plaintiff's Complaint details several specific ways in which the Franchisor Defendants exercised extensive oversight and control over franchise

19

operations. Likewise, the Complaint does not simply recite the knowledge element or plead conclusions. Rather, it details the two primary sources of the Franchisor's knowledge: the "widespread public warning" issued by the Police as well as the duties and presence of multiple individual agents, from the BDAs and franchisee employees (whose agency status is disputed) to field consultants, inspectors, auditors and HR consultants (whose agency status Defendants do not address).

Comparison with *Lawson* underscores the sufficiency of Plaintiff's TVPRA claim. If the condo owner in *Lawson* had routinely sent agents to check in on and direct his sex trafficking tenant's activities and taken no action (even after several of his other condo-rental ventures had resulted in similar TVPRA violations), then it is likely that the plaintiff's complaint would have survived. This outcome would become even more likely if the sex trafficker had also been the *employee* of the condo owner or his agents. Indeed, the fact that Rangel was a supervisor distinguishes Plaintiff's case from nearly every hotel-based TVPRA claim, where the sex traffickers are members of the general public renting rooms.[1]

Further, unlike the plaintiff in *Lundstrom*, Plaintiff does not allege that the Franchisor Defendant merely had knowledge of "sex trafficking generally." Nor are Plaintiff's allegations limited to "instances of trafficking at other franchised locations." To the contrary, Plaintiff specifically alleges that the Franchisor Defendants knew or should

---

[1] In a footnote, the Franchisor Defendants oddly suggest the opposite, i.e. that hotel-based TVPRA cases have more of a "logical connection" to sex trafficking because the hotel rooms are "used in the actual trafficking." ECF 10 at 32, fn 3. But as the Complaint makes clear, Rangel also used the Subway premises to sex-traffic Plaintiff. Thus, the distinction fails and at most is merely an observation that this case does not involve a hotel.

have known about Rangel's conduct at Plaintiff's worksite through the intense level of oversight and control provided by their BDAs and other agents. To require additional specificity regarding precisely who knew *what, when, and how* would be to apply an erroneously heightened pleading standard. Plaintiff has sufficiently alleged that the Franchisor Defendants either knew or should have known, through their agents, that it hired and retained a known sex offender to supervise teenage female workers at its store, and that Plaintiff's supervisor, the known sex offender, was coercing Plaintiff into exchanging sex for drugs, food, and continued employment. ECF 1 ¶¶ 172, 178, 180, 181, 206, 229, 231. Accordingly, Plaintiff states a plausible TVPRA claim against the Franchisor Defendants.

### C.  Plaintiff Plausibly Alleges an Agency Relationship and Vicarious Liability

In their Motion to Dismiss, the Franchisor Defendants describe the existence of an agency relationship connecting the Franchisor Defendants to the Franchisee Defendants as "a threshold and dispositive issue." ECF 10 at 15. Generally (and to the extent the "joint employer" status discussed below is a form of agency relationship), Plaintiff agrees. Such a relationship is necessary for the Franchisor Defendants to be vicariously liable for the negligent or intentional acts of the Franchisee Defendants.

But the parties sharply disagree on whether the "fact-intensive inquiry" involved in determining the existence of an agency relationship can be completed at the pleading stage. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, S.A.S., 269 F.3d 187, 198-99 (3d Cir. 2001) (recognizing that the existence of an agency relationship is a "fact-intensive inquiry" to be decided by the trial court); *see also Madler*

*v. McKenzie County*, 467 N.W.2d 709, 711 (N.D.1991) ( Whether or not there is a duty is generally a question of law for the trial court, but if "the existence of a duty depends upon factual determinations, the facts must be resolved by the trier of fact.") Plaintiff contends that, accepted as true with all inferences drawn in her favor, the facts alleged plausibly support actual and apparent agency. These facts include the multiple ways in which the Franchisor Defendant hold and exercise control over the Franchisee Defendants' operations. Disputes regarding the existence, extent, degree and nature of these control mechanisms can only be resolved at summary judgement or trial.

In contrast, the Franchisor Defendants contend that the existence of certain disclaimers in two documents—a 2003 "Jamestown Franchise Agreement" and a 1990 North Dakota Development Agent Agreement—suffice by themselves to render Plaintiff's claims implausible. That is, they claim two documents from outside the pleadings constitute conclusive support for the vague and sweeping claim that "none of the Franchisee Defendants have any contractual or legal relationship with any of the [Franchisor] Defendants." ECF 10 at 12, ¶ 15. Further, the Franchisor Defendants' assertions regarding the history, purpose and contents of the agreements; who was or was not a party or signatory to the agreements; and the agreements' operative status are all unsupported by any affidavits or declarations and not appropriately considered on a motion to dismiss. *Id.* ¶¶ 6-12, 15, 24-37.

In arguing the evidentiary value of their exhibits, the Franchisor Defendants overstate and mischaracterize Plaintiff's reference to and reliance on them. In fact, only once does the Complaint quote a provision of a franchise agreement—and, as noted above,

that quote is from a publicly available document containing copies of Defendants' standard franchise agreements in use as of 2022. ECF 1. ¶ 91 The agreement allegedly governing Olson and Clark's status as BDAs (Exhibit B, ECF 10-2) is not specifically mentioned at all in the Complaint, which instead alleges facts regarding BDAs' specific role in the operation of the franchise on behalf and at the direction of the Franchisor Defendants.

Moreover, like other references to the many rights reserved in the Franchisor Defendants' franchise agreements, the right in the specific provision quoted—i.e., the "right of entry and inspection"—also exists in their preferred exhibit (*see* ECF 10-1 at 7, sub. "g"), albeit with different verbiage. In any event, this is simply one of several facts alleged in the Complaint regarding how the Franchisor Defendants exercise control in practice. And whether a franchisor exercises sufficient control to be held liable as an agent's principle "depends in each case upon the nature and extent of such control as defined in the franchise agreement *or* by *the actual practice of the parties*." *Drexel v. Union Prescription Ctrs*., 582 F.2d 781, 786 (3d Cir.1978) (emphasis added); *see also Myers v. Garfield & Johnson Enters., Inc.*, 679 F. Supp. 2d 598, 612 (E.D. Pa. 2010) (holding that Title VII plaintiff stated joint employer and apparent authority claims against franchisor by alleging franchisor had "authority to require [franchisee] managers to submit to training and to obey all applicable laws").

In other words, parties generally cannot "contract away a fact." *Takemoto v. United States*, CV 19-00257 JMS-RT, 2020 WL 7698829, at *7 (D. Haw. Oct. 20, 2020). That is, a "franchisor cannot escape vicarious liability for the conduct of its franchisee on the basis of an agreement that claims the franchisee "is not an agent ... or employee" of the

23

franchisor, while simultaneously requiring that the franchisee must "comply strictly at all relevant times with all elements of the [franchisor] [system]." *Id.* (quotations omitted). Likewise, "[t]he existence of a contract referring to a party as an independent contractor does not end the inquiry." *Schwieger v. Farm Bureau Ins. Co. of NE*, 207 F.3d 480, 483 (8th Cir. 2000) (noting that determination of "whether a hired party is an employee or an independent contractor" under common law "involves considerations of all aspects of the working relationship" between the parties and the "economic realities").

Indeed, the U.S. Supreme Court has described "control" as "the principal guidepost" in determining whether an agency relationship exists. *Clackamas Gastroenterology Associates, P. C. v. Wells,* 538 U.S. 440, 448 (2003); *see also S. Pac. Transp. Co. v. Cont'l Shippers Ass'n, Inc.*, 642 F.2d 236, 238 (8th Cir. 1981) (noting that the "factual elements" of agency exist where the agent accepts an "undertaking" on behalf of a principal with the understanding that the principal "is to be in control of the undertaking.") In the franchisor-franchisee context, control of the agent by the principal may exist when "the franchisor has directly or apparently participated in some substantial way in directing or managing acts of the franchisee, beyond the mere fact of providing contractual franchise support activities." *S.Y. v. Naples Hotel Co., 476 F. Supp*. 3d 1251, 1258 (M.D. Fla. 2020).

Here, Plaintiff alleges precisely the kind of control necessary to create a common law agency relationship between the Franchisor and Franchisee Defendants, as codified by N.D.C.C. ch. 3-01. Plaintiff alleges that the Franchisor Defendants controlled material terms and conditions of her employment, including the corporate policies and practices, or lack thereof, that caused her harm. Doc 1. ¶ 45. This control begins with mandatory training

and continues throughout the franchise's existence, facilitated by "intense oversight." *Id.* ¶¶ 78-88, 104. Further, Plaintiff alleges that the Franchisor Defendants, acting through BDAs and others, exercised "oversight, control, and authority…over all aspects of the day-to-day operation" of the franchise. *Id.* ¶ 59. This included those policies and practices specific to her claims, i.e. HR, workplace safety, the physical work environment, and the "hiring, training and supervision of restaurant managers, shift supervisors, and crew members." *Id.* ¶ 60

Thus, the exhibits submitted by Franchisor Defendants do not override or replace allegations of the Franchisor Defendants' actual practice. Nor do they render the allegations "contradicted" or "disproven." ECF 10 at 15 (subheading H). Accordingly, Plaintiff has adequately pleaded the existence of an agency relationship between the Franchisor Defendants and Franchisee Defendants, such that the former may be held vicariously liable for the tortious conduct of the latter as to each of the seven counts.

In addition to the actual agency relationship, Plaintiff sufficiently alleges "ostensible" or "apparent" agency. That is, Plaintiff alleges that she reasonably believed that she worked for the Connecticut-based Franchisor Defendants, who collectively do business as "Subway." ECF 1, ¶ 66. This belief is based on the conduct and communication of the Franchisor Defendants, not the franchisee. That is, it was the *Franchisor* Defendants who are alleged to have solicited, obtained and processed Plaintiff's job application; and designed and required her to wear, provide, and follow Subway uniforms, products, and policies. *Id.* ¶ 66. This fact is, if anything, merely bolstered—not negated or contradicted—by the additional fact that the belief was confirmed by the Franchisee Defendants (who

25

cannot by themselves create apparent authority). *Id.* ¶ 67; *see also Bartholomew v. Burger King Corp.*, 15 F. Supp. 3d 1043, 1048 (D. Haw. 2014) (denying franchisor summary judgment on apparent agency and reasoning that "a single sign indicating that a franchisee owns the particular restaurant at issue may not necessarily overcome the public perception of agency").

Finally, the Franchisor Defendants' agency argument duplicates assertions made as part of their "shotgun pleading" argument, addressed above. For example, the Franchisor Defendants argue that Plaintiff "does not specifically attribute to Defendant SIP any other act, contract, conduct, or communication regarding the Franchisee Defendants" other than the allegations in Complaint ¶ 25 regarding Defendant SIP's responsibility for the centralized Subway hiring website. ECF. 10 ¶ 23. Presenting a website's fine print as their "Exhibit C," "the Terms and Conditions tab of the website" (which states that a different entity "owns and operates" the site), they argue that this exhibit somehow "contradicts and is repugnant to" the allegations in the complaint regarding Defendant SIP. *Id.* ¶¶ 21-22.

Even assuming the exhibit is squarely contradictory (it is not), the argument's premise is flawed. Paragraph 25 is not, in fact, the "only contract, conduct, or communication regarding the Franchisee Defendants" attributed to Defendant SIP in the Complaint. To the contrary, the Complaint details Defendant SIP's role as "the owner and licensor of the Subway® trademark and all… business methods, business forms, and business policies and practices (referred to by Defendants as the "Subway Franchise System" or "System"), which it licenses to Defendant DAL and implements in concert with

each of the co-defendants." ECF 1, ¶ 51. The Complaint is also clear that Defendant SIP is not the sole entity responsible for the hiring website. *Id.* ¶ 94.

Plaintiff has plausibly alleged multiple forms of extensive control and authority held and/or exercised by the Franchisor Defendants. As in *Johnson*, "taken as true, these allegations are sufficient to raise the reasonable expectation that discovery will reveal evidence of a joint employer or agency relationship." *Johnson*, 542 F. Supp. 3d at 891. While franchisor-franchisee agency issues arising out of employment claims are frequently addressed after discovery, the Franchisor Defendants tellingly fail to cite a single case resolving the issue on a motion to dismiss. Plaintiff submits that such cases are scarce and no doubt easily distinguishable.

### D.  Plaintiff Plausibly Alleges Joint Employer Status and Direct Liability

In their Motion to Dismiss, the Franchisor Defendants do not dispute or otherwise address the sufficiency of the Complaint's allegations against the Franchisee Defendants. That is, they do not argue that the facts and conduct attributed to the *Franchisee* Defendants fail to state claims against those Defendants under the TVPRA or for negligence, assault/battery, or wrongful imprisonment (Counts 1-7). Thus, the Franchisor Defendants' dismissal arguments hinge primarily on vicarious liability and the agency principles addressed in the preceding subsection.

However, the Complaint also plausibly alleges a second, separate basis for direct liability, i.e., direct liability as Plaintiff's "joint employer."  Unlike many cases involving a joint employer analysis, such as federal discrimination claims, none of Plaintiff's claims

hinge on the statutory definition of terms like "employee." Thus, the joint employer analysis overlaps almost completely with the above-described agency analysis.

Nonetheless, to the extent Plaintiff seeks to hold the Franchisor Defendants directly liable—as employers—for negligent hiring and supervision and for the acts committed by Rangel in the course of his employment, Plaintiff must plausibly plead that they are joint employers along with the Franchisee Defendants. Generally, the existence of a joint employer relationship depends on four factors: "1) the interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control." *Baker v. Stuart Broad. Co.*, 560 F.2d 389 (8th Cir.1977).

While "no single factor is dispositive", *Scheidecker v. Arvig Enterprises, Inc.*, 122 F. Supp. 2d 1031, 1038 (D. Minn. 2000), the concept of "control" looms large in joint-employer cases involving franchisor-franchisee relationships. *See, e.g., Stepan v. Bloomington Burrito Group, LLC*, CIV. 14-3288 ADM/TNL, 2014 WL 7338786, at *3 (D. Minn. Dec. 22, 2014) ("Finding that companies are joint employers is proper where one company retains for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer."). For example, in *Stepan*, the court denied the defendant-franchisor's motion to dismiss and held that former restaurant workers sufficiently alleged that the franchisor was their joint employer. *Id.* The court reasoned that, "[w]hile discovery may later prove otherwise, at this stage, Plaintiffs have plausibly pled that [the franchisor]… is the corporate enterprise that managed and jointly operated the restaurant where Plaintiffs worked" and the entity that "instituted" the employment "policies" relevant to their claims. *Id.*

28

Likewise, in *Smith v. JEENS*, the court denied McDonald's USA's motion to dismiss joint employer allegations brought by former McDonalds workers. 566 F. Supp. 3d at 946. The court reasoned that although "[h]istorically, franchisors have not been viewed by the courts as joint employers of their franchisees' primary employees," an exception exists "under those limited circumstances where the franchisor exercised a high degree of direct and immediate control over the franchisees' employees' terms and conditions of employment." *Id.* Citing the plaintiffs' allegations regarding the franchisor's issuance of harassment policies and procedures as well as related training of employees and managers, the court noted that "determining the level of control… is a material question of fact dependent on discovery and development of the factual record." *Id.; see also Johnson*, 542 F. Supp. 3d at 891 (denying motion to dismiss and distinguishing cases cited by franchisor defendant as "not good comparisons" because they were cases "decided at the summary judgment phase" where plaintiffs had "had the benefit of discovery.")

While Plaintiff has alleged an impressive amount of detail regarding the individual and collective roles of the Franchisor Defendants, she does not, and cannot, "yet possess the corporate documents and other evidence of Defendants' operations that are necessary for answering the fact-intensive inquiry of whether [the Franchisor Defendants were] her employer." *Stepan*, 2014 WL 7338786, at *3. Indeed, "Plaintiffs are not required to plead the entirety of their case while toeing the starting blocks." *Id.* (citing *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 796–97 (8th Cir.2009) (holding that corporate documents included substantial evidence that parent company was employer for Title VII claim)).

29

Here, Plaintiff has sufficiently alleged the Franchisor Defendants exercised substantial control over the Franchisee Defendants. The Complaint also identifies common management (e.g. Olson and Clark), a centralized chain-of-command with the Franchisor Defendants' executives at the top; and interrelated operations, including the ability of the Franchisor Defendants to replace employees and mandate training. Accordingly, Plaintiff has plausibly stated a claim against the Franchisor Defendants based on their status as joint employers. In that capacity, they owed the same duties of care to Plaintiff as the Franchisee Defendants—duties they violated when Rangel, a registered sex offender with a history of violently assaulting children and teenagers, was assigned to supervise Plaintiff, a minor, on the night shift with two other sex offenders.

## V.   CONCLUSION

Plaintiff has sufficiently pleaded facts showing the unique extent to which the Franchisor Defendants had control over and involvement in the operation of the restaurant where she was repeatedly assaulted by her supervisor. She has therefore stated a claim against the Franchisor Defendants under the TVPRA and for both vicarious liability and joint employer liability. Accordingly, Plaintiff respectfully requests that this Court deny the Franchisor Defendants' Motion to Dismiss in its entirety as to each Count.

In the alternative, if the Court finds pleading deficiencies, Plaintiff respectfully requests the Court to allow her to file a motion for leave to amend the Complaint. This case certainly presents circumstances where leave should be given because "justice so requires." Fed. R. Civ. P. 15(a); *see Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 943 (8th Cir.

2000) (holding that amendment "should normally be granted absent good reason for a denial" such as "undue delay, bad faith or dilatory motive, [or] repeated failure to cure deficiencies by amendments previously allowed….").

                                  Respectfully submitted,

Dated: April 5, 2024               **HALUNEN LAW**

                                */s/Brittany Deane Salyers*
                                Brittany Deane Salyers (MN #0396239)*
                                Pamela A. Johnson (MN #0269667)*
                                Kyle P. Hahn (MN #0399588)*
                                Paul M. Schinner (WI #1093983)*
                                1650 IDS Center
                                80 South Eighth Street
                                Minneapolis, MN 55402
                                Telephone: (612) 605-4098
                                Facsimile: (612) 605-4099
                                p.johnson@halunenlaw.com
                                salyers@halunenlaw.com
                                hahn@halunenlaw.com
                                schinner@halunenlaw.com
                                *Admitted Pro Hac Vice*

                                *ATTORNEYS FOR PLAINTIFF*

                                **WOLD JOHNSON, P.C.**

                                By:  */s/Benjamin E. Thomas*
                                Benjamin E. Thomas – 04713 (ND#)
                                Mark A. Beauchene – 03546 (ND#)
                                Attorney for Plaintiff
                                500 Second Avenue North, Suite 400
                                P.O. Box 1680
                                Fargo, ND 58107
                                Telephone: (701) 235-5515
                                bthomas@woldlaw.com
                                mbeauchene@woldlaw.com
                                *ATTORNEYS FOR PLAINTIFF*

31